1 | CHARLES F. PREUSS (State Bar No. 45783)
2 | BRENDA N. BUONAIUTO (State Bar No. 173919)
DRINKER BIDDLE & REATH LLP
3 | 50 Fremont Street, 20th Floor
San Francisco, California 94105
4 | Telephone: (415) 591-7500
Facsimile: (415) 591-7510
5 | charles.preuss@dbr.com
brenda.buonaiuto@dbr.com

6 | Attorneys for Defendants
7 | ORTHO-MCNEIL PHARMACEUTICAL, INC., now
known as ORTHO-McNEIL-JANSSEN
8 | PHARMACEUTICALS, INC.,
and MCKESSON CORPORATION

ORIGINAL
FILED

JAN 3 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA



11 | SAN FRANCISCO DIVISION

12 | MIRANDA ADAMS, an individual;
AUDREY ALEXANDER, an individual;
13 | FALLON ARENIVAS, an individual;
CORRINE BELLUCCI, an individual;
14 | RAQUEL BOONE, an individual;
DANIELLE BOUDREAUX, an individual;
15 | TASHIANA BRADLEY, an individual;
CHERI BRANHAM, an individual;
16 | RHONDA CARTER, an individual; TAMU
CARTER, an individual; STARSHA
17 | CLOSE, an individual; THOMASITA
CURLEY, an individual; ONILDA
18 | DASILVA, an individual;ADELE
DUPLECHAIN, an individual; SYLVIA
19 | EDWARDS, an individual; MISHEKIA
FREELON, an individual; RENATA
20 | GAINES, an individual; JANET GUIDRY,
an individual; VICTORIA HARRIS,
21 | individual; APRIL JANUTOLO, an
individual; OLIVIA JOSEPH, an individual;
22 | CHRISTINA MARK, an individual;
SHARON MARSHALL-FRYER, an
23 | individual; ANNA MARTINEZ, an
individual; JESSICA MCDANIEL, an
24 | individual; JANICE MCDONALD, an
individual; KELVANNTI MORGAN, an
25 | individual; WANDA MORGAN, an
individual; KELSEY MUNYON, an
26 | individual; TONI NICHOLS, an individual;
LAKISHA PACE, an individual; ASHLEY
27 | PARKER, an individual; YOLANDA
PAGE, an individual; ANGELICA PEREZ,
28 | an individual; STEPHANIE REAY, an

Case No. C 08 0731

**DECLARATION OF BRENDA N.
BUONAIUTO IN SUPPORT OF
NOTICE OF REMOVAL AND
REMOVAL OF ACTION UNDER 28
U.S.C. § 1441(b) [DIVERSITY]**

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

394614v1

DECLARATION IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL         CASE NO.

1  individual; IVONNE CLAUDIO REYES, an individual; NICHOLE SHULTZ, an
2  individual; CASSANDRA SLIMMER, an individual; NANCY STARTS, an
3  individual; RHONDA STYLES, an individual; MICHELLE TAYLOR-
4  JANSEN, an individual; KEMBLEY THOMAS, an individual; TOINETTA
5  VANHORN, an individual; CAMILLE WILLIAMS, an individual;

6
                              Plaintiffs,
7
          v.
8
   ORTHO-MCNEIL PHARMACEUTICAL,
9  INC., a Delaware Corporation;
   MCKESSON CORP. and DOES 1-500,
10 inclusive,

11                           Defendants.

12
13        I, Brenda N. Buonaiuto, declare:
14        1.     I am an attorney admitted to practice before all courts of the State of
15 California and am a partner in the law firm of Drinker Biddle & Reath, LLP, attorneys for
16 defendants Ortho-McNeil Pharmaceutical, Inc. ("OMP"), now known as Ortho-McNeil-
17 Janssen Pharmaceuticals, Inc. ("OMJPI"), and McKesson Corporation ("McKesson") in
18 this action. I make this Declaration based on my personal knowledge, in support of the
19 removal by OMP, now known as OMPJI, of *Miranda Adams, et al. v. Ortho-McNeil*
20 *Pharmaceutical, Inc., McKesson Corp., and Does 1-500, inclusive*, Case Number CGC-
21 07-466704 to this Court. I would and could competently testify to the matters stated in
22 this Declaration if called as a witness.
23        2.     A true and accurate copy of the First Amended Complaint (the
24 "Complaint") in this action is attached as **Exhibit A**. The Complaint is the only state
25 court pleading known to OMP, now known as OMPJI, and to McKesson to have been
26 filed in this action.
27        3.     OMP was a corporation existing under the laws of the State of Delaware,
28 with its principal place of business in New Jersey, and is now known as OMPJI, which is

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

                                         1
DECLARATION IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL          CASE NO.

1    a Pennsylvania corporation, with its principal place of business also in New Jersey.

2    OMP, now known as OMPJI, was served with the Summons and First Amended

3    Complaint in this action on January 7, 2008.

4          4.      McKesson was served with the Summons and Complaint in this action on

5    January 4, 2008. McKesson consents to removal of this action to this Court.

6          5.      OMP, now known as OMPJI, will file a notice of the filing of this Notice of

7    Removal and Removal in the San Francisco County Superior Court and will serve

8    plaintiffs' counsel with a copy.

9          6.      On March 1, 2006, the Judicial Panel on Multidistrict Litigation ("JPML")

10   created MDL 1742, *In re: Ortho Evra Products Liability Litigation*, ruling that all

11   federal actions involving allegations of injury or death from use of the prescription drug

12   Ortho Evra® be centralized for pre-trial purposes in the United States District Court for

13   the Northern District of Ohio, before the Honorable David A. Katz, Case Number 1:06-

14   CV-40000-DAK. To date, over 900 cases have been transferred to MDL 1742, and

15   transfers of additional "tag-along" actions are pending.

16         7.      Attached as **Exhibit B** is a true and accurate copy of the Declaration of

17   Greg Yonko, Senior Vice President – Purchasing, McKesson Corporation, filed in *Abel,*

18   *Theresa, et al. v. Ortho-McNeil Pharmaceutical, Inc., et al.*, United States District Court,

19   Northern District of California, Case No. C 06 7551 SBA, on December 8, 2006.

20         8.      Attached as **Exhibit C** is a true and accurate copy of the Slip Opinion

21   denying the plaintiffs' motion to remand in *In re Phenylpropanolamine ("PPA")*

22   *Products Liability Litigation*, MDL No. 1407, Docket No. C02-423R, in the United

23   States District Court for the Western District of Washington (Seattle), dated November

24   27, 2002.

25         9.      Attached as **Exhibit D** is a true and accurate copy of the Slip Opinion

26   denying the plaintiffs' motion to remand in *Barlow, et al. v. Warner-Lambert Co., et al.*,

27   Case No. CV 03-1647-R(RZx), in the United States District Court for the Central District

28   of California (Western Division), dated April 28, 2003.

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

2
DECLARATION IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL          CASE NO.

1    10.    Attached as **Exhibit E** is a true and accurate copy of the Slip Opinion

2    denying the plaintiffs' motion to remand in *Skinner, et al. v. Warner-Lambert Co., et al.,*

3    Case No. CV 03-1643-R(RZx), in the United States District Court for the Central District

4    of California (Western Division), dated April 28, 2003.

5    11.    I have reviewed reports of verdicts and settlements in cases in this judicial

6    district, brought by plaintiffs claiming serious injuries from the use of prescription drugs

7    or medical devices.  Given the similarity between the injuries alleged in those cases and

8    plaintiffs' claims, it is reasonably believed that if plaintiffs succeeded in proving their

9    allegations in this action, they would each recover in excess of $75,000, exclusive of

10    interest and costs.  Plaintiffs claiming substantially similar injuries in the Ortho Evra®

11    MDL have specifically alleged that the amount in controversy in their respective actions

12    exceeds $75,000, exclusive of interest and costs.

13    I declare under penalty of perjury under the laws of the United States of America that

14    the foregoing is true and correct.  Executed on January 3⎨, 2008.

15

16    Brenda N. Buonaiuto

17

18

19

20

21

22

23

24

25

26

27

28

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

3

DECLARATION IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL          CASE NO.

**EXHIBIT A**

12/19/2007 WED 12:40  FAX                                                                      ☒029/033

1   SHAWN KHORRAMI, ESQ., SBN 180411
    DYLAN POLLARD, ESQ., SBN 180306
2   SONIA TANDON, ESQ., SBN 239614
    KHORRAMI, POLLARD & ABIR, LLP
3   444 S. Flower Street
    Thirty-Third Floor
4   Los Angeles, CA 90071
    Telephone: (213) 596-6000
5   Facsimile:  (213) 596-6010
    email: skhorrami@kpalawyers.com
6
    BRIAN KABATECK, ESQ., SBN 152054
7   RICHARD KELLNER, ESQ., SBN 171416
    KABATECK BROWN KELLNER LLP
8   644 South Figueroa Street
    Los Angeles, CA 90071
9   Telephone: (213) 217-5000
    Facsimile:  (213) 217-5010
10  email: bsk@kbklawyers.com

11  MICHAEL S. BURG, ESQ.
    SETH A. KATZ, ESQ.
12  JANET G. ABARAY, ESQ.
    BURG SIMPSON ELDREDGE HERSH JARDINE PC
13  40 Inverness Drive East
    Denver, CO 80112
14  Telephone: (303) 792-5595
    Facsimile: (303) 768-0527
15
    Attorneys for Plaintiffs
16

17

18          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF SAN FRANCISCO
19
20  MIRANDA ADAMS, an individual; AUDREY )      Case No. CGC-07-466704
    ALEXANDER, an individual; FALLON      )
21  ARENIVAS, an individual; CORRINNE     )
    BELLUCCI, an individual; RAQUEL       )      FIRST AMENDED COMPLAINT FOR
22  BOONE, an individual; DANIELLE        )      DAMAGES BASED ON:
    BOUDREAUX, an individual; TASHIANA    )
23  BRADLEY, an individual; CHERI         )      1.   NEGLIGENCE
    BRANHAM, an individual; RHONDA        )      2.   STRICT PRODUCT LIABILITY -
24  CARTER, an individual; TAMU CARTER, an)           FAILURE TO WARN
    individual; STARSHA CLOSE, an individual; )   3.   BREACH OF EXPRESS
25  THOMASITA CURLEY, an individual;      )           WARRANTY
    ONILDA DASILVA, an individual; ADELE  )      4.   BREACH OF IMPLIED
26  DUPLECHAIN, an individual; SYLVIA     )           WARRANTY
    EDWARDS, an individual; MISHEKIA      )      5.   NEGLIGENT
27  FREELON, an individual; RENATA GAINES, )          MISREPRESENTATION
    an individual; JANET GUIDRY, an individual; ) 6.  FRAUD
28  VICTORIA HARRIS, an individual; APRIL )
    JANUTOLO, an individual; OLIVIA JOSEPH, )     DEMAND FOR JURY TRIAL

                                          1
    FIRST AMENDED COMPLAINT FOR DAMAGES

ENDORSED FILED
SUPERIOR COURT
COUNTY OF SAN FRANCISCO

DEC 0 3 2007

GORDON PARK-LI, Clerk
BY: _____
            Deputy Clerk

1  an individual; CHRISTINA MARK, an    )
   individual; SHARON MARSHALL-FRYER,    )
2  an individual; ANNA MARTINEZ, an    )
   individual; JESSICA MCDANIEL, an    )
3  individual; JANICE MCDONALD, an    )
   individual; KELVANNTI MORGAN, an    )
4  individual; WANDA MORGAN, an    )
   individual; KELSEY MUNYON, an    )
5  individual; TONI NICHOLS, an individual;    )
   LAKISHA PACE, an individual; ASHLEY    )
6  PARKER, an individual; YOLANDA PAGE,    )
   an individual; ANGELICA PEREZ, an    )
7  individual; STEPHANIE REAY, an individual; )
   IVONNE CLAUDIO REYES, an individual;    )
8  NICHOLE SHULTZ, an individual;    )
   CASSANDRA SLIMMER, an individual;    )
9  NANCY STARTS, an individual; RHONDA    )
   STYLES, an individual; MICHELLE    )
10 TAYLOR-JANSEN, an individual;    )
   KEMBLEY THOMAS, an individual;    )
11 TOINETTA VANHORN, an individual;    )
   CAMILLE WILLIAMS, an individual;    )
12                                        )
                Plaintiffs                )
13                                        )
                   v.                     )
14                                        )
   ORTHO-MCNEIL PHARMACEUTICAL,           )
15 INC., a Delaware Corporation; MCKESSON )
   CORP and DOES 1-500, inclusive,        )
16                                        )
                Defendants                )
17 _____)

18 Plaintiffs allege as follows:

19                **INTRODUCTION**

20      1.      Plaintiffs are all individuals who have consumed Defendant ORTHO-MCNEIL

21 PHARMACEUTICAL INC.'s drug Ortho Evra® (hereinafter referred to as "Ortho Evra". Each

22 of the Plaintiffs herein have suffered and/or may continue to suffer potentially fatal side effects

23 such as strokes, pulmonary emboli, blood clots, deep vein thrombosis, and heart attacks.

24      2.      Defendant ORTHO-MCNEIL PHARMACEUTICAL INC (hereinafter "ORTHO-

25 MCNEIL") designed, researched, manufactured, advertised, promoted, marketed sold and/or

26 distributed Ortho Evra. Furthermore, Defendant ORTHO-MCNEIL concealed its knowledge of

27 Ortho Evra's risks and trivialized the serious side effects of Ortho Evra from Plaintiffs,

28 Plaintiff's physicians, pharmacists and the public in general.

                         2

**FIRST AMENDED COMPLAINT FOR DAMAGES**

3.     Defendant MCKESSON CORP ("hereinafter "MCKESSON") is a corporation whose principle place of business is San Francisco, California. MCKESSON distributed and sold Ortho Evra in and throughout the State of California.

4.     Ortho Evra is an adhesive transdermal birth control patch that delivers continuous levels of the hormones progestin and estrogen through the skin and into the blood stream to prevent pregnancy. Ortho Evra was approved by the FDA in November 2001 and since has been used by over 4 million women. On November 10, 2005 the FDA issued a warning about the increased risks of blood clots associated with the use of Ortho Evra. Specifically, users of Ortho Evra are exposed to 60% more total estrogen in their blood than users of the typical birth control pill which contains 35 micrograms of estrogen.

## JURISDICTION AND VENUE

5.     The California Superior Court has jurisdiction over this action pursuant to California Constitution Article VI, Section 10, which grants the Superior Court "original jurisdiction in all causes except those given by statute to other trial courts." The Statutes under which this action is brought do not specify any other basis for jurisdiction.

6.     The California Superior Court has jurisdiction over the Defendants because, based on information and belief, each is a corporation and/or entity and/or person organized under the laws of the State of California, a foreign corporation or association authorized to do business in California and registered with the California Secretary of State or has sufficient minimum contacts in California, is a citizen of California, or otherwise intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by the California courts consistent with traditional notions of fair play and substantial justice.

7.     Venue is proper in this Court pursuant to California Code of Civil Procedure Section 395 in that Defendant MCKESSON has its principle place of business in San Francisco.

8.     Furthermore Defendants ORTHO-MCNEIL and MCKESSON have purposefully availed themselves of the benefits and the protections of the laws within the State of California. Defendant MCKESSON has its principle place of business within the state. Defendants ORTHO-MCNEIL and MCKESSON have had sufficient contact such that the exercise of jurisdiction

3

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1    would be consistent with the traditional notions of fair play and substantial justice.

2        9.    Plaintiffs each individually seek relief that is within the jurisdictional limits of the

3    court.

4                                    **PARTIES**

5                                    **PLAINTIFFS**

6        10.    Plaintiff MIRANDA ADAMS is a resident of Canan, Georgia, who was

7    prescribed Ortho Evra and was severely injured as a result.

8        11.    Plaintiff AUDREY ALEXANDER is a resident of Colorado Springs, Colorado,

9    who was prescribed Ortho Evra and was severely injured as a result.

10        12.    Plaintiff FALLON ARENIVAS is a resident of Chico, California, who was

11    prescribed Ortho Evra and was severely injured as a result.

12        13.    Plaintiff CORRINNE BELLUCCI is a resident of North Bellmore, New York,

13    who was prescribed Ortho Evra and was severely injured as a result.

14        14.    Plaintiff RAQUEL BONNE is a resident of Ocala, Florida, who was prescribed

15    Ortho Evra and was severely injured as a result.

16        15.    Plaintiff DANIELLE BOUDREAUX is a resident of Luling, Louisiana, who was

17    prescribed Ortho Evra and was severely injured as a result.

18        16.    Plaintiff TASHIANA BRADLEY is a resident of Adelanto, California, who was

19    prescribed Ortho Evra and was severely injured as a result.

20        17.    Plaintiff CHERI BRANHAM is a resident of Philadelphia, Pennsylvania, who

21    was prescribed Ortho Evra and was severely injured as a result.

22        18.    Plaintiff RHONDA CARTER is a resident of Natchez, Mississippi, who was

23    prescribed Ortho Evra and was severely injured as a result.

24        19.    Plaintiff TAMU CARTER is a resident of Chicago, Illinois, who was prescribed

25    Ortho Evra and was severely injured as a result.

26        20.    Plaintiff STARSHA CLOSE is a resident of Bainbridge, Georgia, who was

27    prescribed Ortho Evra and was severely injured as a result.

28        21.    Plaintiff THOMASITA CURLEY is a resident of Lukachukai, Arizona, who was

                                      4

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  prescribed Ortho Evra and was severely injured as a result.

2  22.    Plaintiff ONILDA DASILVA is a resident of Dorchester, Massachusetts, who

3  was prescribed Ortho Evra and was severely injured as a result.

4  23.    Plaintiff ADELE DUPLECHAIN is a resident of Snellville, Georgia, who was

5  prescribed Ortho Evra and was severely injured as a result.

6  24.    Plaintiff SYLVIA EDWARDS is a resident of Baker, Louisiana, who was

7  prescribed Ortho Evra and was severely injured as a result.

8  25.    Plaintiff MISHEKIA FREELON is a resident of Los Angeles, California, who

9  was prescribed Ortho Evra and was severely injured as a result.

10  26.    Plaintiff RENATA GAINES is a resident of Erie, Pennsylvania, who was

11  prescribed Ortho Evra and was severely injured as a result.

12  27.    Plaintiff JANET GUIDRY is a resident of Matteson, Illinois, who was prescribed

13  Ortho Evra and was severely injured as a result.

14  28.    Plaintiff VICTORIA HARRIS is a resident of Chicago, Illinois, who was

15  prescribed Ortho Evra and was severely injured as a result.

16  29.    Plaintiff APRIL JANUTOLO is a resident of Bluefield, Virginia, who was

17  prescribed Ortho Evra and was severely injured as a result.

18  30.    Plaintiff OLIVIA JOSEPH is a resident of San Antonio, Texas, who was

19  prescribed Ortho Evra and was severely injured as a result.

20  31.    Plaintiff CHRISTINA MARK is a resident of Chicago, Illinois, who was

21  prescribed Ortho Evra and was severely injured as a result.

22  32.    Plaintiff SHARON MARSHALL-FRYER is a resident of Clayton, Alabama, who

23  was prescribed Ortho Evra and was severely injured as a result.

24  33.    Plaintiff ANNA MARTINEZ is a resident of North Hills, California, who was

25  prescribed Ortho Evra and was severely injured as a result.

26  34.    Plaintiff JESSICA MCDANIEL is a resident of Mentor, Ohio, who was

27  prescribed Ortho Evra and was severely injured as a result.

28  35.    Plaintiff JANICE MCDONALD is a resident of San Antonio, Texas, who was

5

1  prescribed Ortho Evra and was severely injured as a result.

2      36.    Plaintiff KELVANNTI MORGAN is a resident of Houston, Texas, who was

3  prescribed Ortho Evra and was severely injured as a result.

4      37.    Plaintiff WANDA MORGAN is a resident of Houston, Texas, who was

5  prescribed Ortho Evra and was severely injured as a result.

6      38.    Plaintiff KELSEY MUNYON is a resident of Rapid City, South Dakota, who was

7  prescribed Ortho Evra and was severely injured as a result.

8      39.    Plaintiff TONI NICHOLS is a resident of Cincinnati, Ohio, who was prescribed

9  Ortho Evra and was severely injured as a result.

10      40.    Plaintiff LAKISHA PACE is a resident of Macon, Georgia, who was prescribed

11  Ortho Evra and was severely injured as a result.

12      41.    Plaintiff ASHLEY PACKER is a resident of Salem, Massachusetts, who was

13  prescribed Ortho Evra and was severely injured as a result.

14      42.    Plaintiff YOLANDA PAGE is a resident of Wesley Chapel, Florida, who was

15  prescribed Ortho Evra and was severely injured as a result.

16      43.    Plaintiff ANGELICA PEREZ is a resident of Rawlins, Wyoming, who was

17  prescribed Ortho Evra and was severely injured as a result.

18      44.    Plaintiff STEPHANIE REAY is a resident of Newport Beach, California, who

19  was prescribed Ortho Evra and was severely injured as a result.

20      45.    Plaintiff IVONNE CLAUDIO REYES is a resident of Providence, Rhode Island,

21  who was prescribed Ortho Evra and was severely injured as a result.

22      46.    Plaintiff NICHOLE SHULTZ is a resident of South Webster, Ohio, who was

23  prescribed Ortho Evra and was severely injured as a result.

24      47.    Plaintiff CASSANDRA SLIMMER is a resident of Chicago, Illinois, who was

25  prescribed Ortho Evra and was severely injured as a result.

26      48.    Plaintiff NANCY STARTS is a resident of Champaigne, Illinois, who was

27  prescribed Ortho Evra and was severely injured as a result.

28      49.    Plaintiff RHONDA STYLES is a resident of Chicago, Illinois, who was

6

FIRST AMENDED COMPLAINT FOR DAMAGES

1    prescribed Ortho Evra and was severely injured as a result.

2       50.    Plaintiff MICHELLE TAYLOR-JANSEN is a resident of Lockport, New York,

3    who was prescribed Ortho Evra and was severely injured as a result.

4       51.    Plaintiff KEMBLEY THOMAS is a resident of Montgomery, Alabama, who was

5    prescribed Ortho Evra and was severely injured as a result.

6       52.    Plaintiff TOINETTA VANHORN is a resident of Detroit, Michican, who was

7    prescribed Ortho Evra and was severely injured as a result.

8       53.    Plaintiff CAMILLE WILLIAMS is a resident of Edgewood, Maryland, who was

9    prescribed Ortho Evra and was severely injured as a result.

10                         **DEFENDANTS**

11       54.    Defendant ORTHO-MCNEIL  is, and at all times material to this action was, a

12    corporation organized, existing and doing business under and by the virtue of the laws of the

13    State of Delaware, with its principle office located at 1000 Route 202 South, P.O. Box 300,

14    Raritan, New Jersey 08869.

15       55.    Defendant ORTHO-MCNEIL is, and at all times material to this action was,

16    authorized to do business, and was engaged in business in the State of California.  ORTHO-

17    MCNEIL derives substantial revenue from goods consumed within the State of California.

18       56.    Defendant ORTHO-MCNEIL includes any and all parents, subsidiaries, affiliates,

19    divisions, franchises, partners, joint venturers and organizational units of any kind, their

20    predecessors, successors and assigns and their pr0esent officers, directors, employees, agents,

21    representatives and other persons acting on their behalf.

22       57.    Plaintiffs are informed and believe, and based thereon allege, that in committing

23    the acts alleged herein, each and every managing agent, agent, representative and/or employee of

24    the defendant was working within the course and scope of said agency, representation and/or

25    employment with the knowledge, consent, ratification, and authorization of the Defendant and its

26    directors, officers and/or managing agents.

27       58.    At all times material to this action, Defendant ORTHO-MCNEIL developed,

28    manufactured, marketed, promoted, sold and/or distributed Ortho Evra in the stream of

**FIRST AMENDED COMPLAINT FOR DAMAGES**

commerce and in the State of California and the rest of the country.

59. Defendant MCKESSON is, and at all times material to this action was, a corporation organized, existing and doing business under and by virtue of the laws of the State of Delaware, with its principle place of business in San Francisco, California. MCKESSON is, and at all times material to this action was, authorized to do business, and was engaged in substantial commerce and business under the laws of the State of California.

60. Defendant MCKESSON includes any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers and organizational units of any kind, their predecessors, successors and assigns and their present officers, directors, employees, agents, representatives and other persons acting on their behalf.

61. Plaintiffs are informed and believe, and based thereon allege, that in committing the acts alleged herein, each and every managing agent, agent, representative and/or employee of Defendant MCKESSON was working within the course and scope of said agency, representation and/or employment with the knowledge, consent, ratification and authorization of the defendant and its directors, officers and/or managing agents.

62. At all times relevant to this action, Defendant MCKESSON packaged, distributed, supplied, sold, placed into the stream of commerce, labeled, described, marketed, advertised, promoted and purported to warn or to inform users regarding the risks pertaining to, and assuaged concerns about the pharmaceutical Ortho Evra.

63. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants named herein as DOES 1 through 500, and each of them, are unknown to Plaintiffs, who therefore, sues said Defendants by such fictitious names.

64. Plaintiffs will ask leave to amend this Complaint to state said Defendants' true identities and capacities when the same has been ascertained.

65. Plaintiffs are informed and believe and based thereupon allege that each of the Defendants designated herein as DOE took part in and participated with the Defendant in all matters referred to herein and was in some manner responsible for the injuries and losses suffered by the Plaintiffs.

8

**FIRST AMENDED COMPLAINT FOR DAMAGES**

66.    Plaintiffs are informed and believe and based thereupon allege that at all times herein mentioned each of the Defendants was the agent, servant and/or employee or occupied other relationships with each of the other named Defendants and at all times herein mentioned acted within the course and scope of said agency and/or employment and/or other relationship and each other Defendant has ratified, consented to, and approved the acts of his agents, employees, and representatives, and that each actively participated in, aided and abetted, or assisted one another in the commission of the wrongdoing alleged in this Complaint.

## GENERAL ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

67.    ORTHO-MCNEIL is the world's leading manufacturer of prescription contraceptives as well as the current market leader in oral and patch contraceptive products. ORTHO-MCNEIL offers a range of prescription birth control options to women, including Ortho Evra, the first transdermal contraceptive patch, ten birth control pills and two diaphragms.

68.    The pharmaceutical drug at issue in this litigation is "Ortho Evra". Ortho Evra is the first and only once a week birth control patch. It is worn on the skin for one week and replaced on the same day of the week for three consecutive weeks, with the fourth week free from the patch. Unlike traditional oral contraceptives, such as the birth control pill, that are ingested and metabolized by the body's digestive system, the Ortho Evra patch continuously releases estrogen and progestin *directly into* the bloodstream.

69.    ORTHO-MCNEIL filed a new drug application for Ortho Evra on or about December 21, 2000. In the same year, doctors at the FDA reviewing the clinical trials of the Ortho Evra patch warned that blood clots could be a problem if the patch were approved. This was after two of the women developed deep vein thrombosis (a blood clot that forms in the deep veins of leg or pelvic region) which led to pulmonary embolism (a serious and deadly condition of deep vein thrombosis where the clot breaks off into the lung and clogs an artery). One medical reviewer wrote that it would be important to study users after Ortho Evra came into the market for clot problems.

70.    Despite those concerns, Ortho Evra received FDA approval for the prevention of pregnancy in November of 2001. Since then, Ortho Evra has been prescribed to more than 4

9

1  million women and has become one of the fastest growing birth control method in the United

2  States.

3       71.     Since its approval the there have been many reports that indicate the serious risks

4  associated with the consumption of Ortho Evra. In particular, the FDA has logged 9,116 reports

5  of adverse reactions to the patch in a **17 month** period. This is significantly higher than 1,237

6  adverse reports generated in a **6 year** period for ORTHO-MCNEIL's oral contraceptive, Ortho

7  Tri-Cyclen. According to the FDA, this only represents 1% - 10% of patch related medical

8  problems so these adverse reactions are actually more prevalent.

9       72.     Furthermore, reports provided by the FDA indicate that the risk of developing

10  and/or dying from a blood clot while using the Ortho Evra patch is at least three times higher

11  than when using birth control pills.

12       73.     On November 10, 2005, the FDA required that the warning label for Ortho Evra

13  be updated to included a new warning indicating that use of Ortho Evra exposes women to a

14  higher level of estrogen than use of other birth control methods. Specifically, the new bolded

15  warning stated that women who use Ortho Evra are exposed to about 60% more total estrogen in

16  their blood than if they were taking a typical birth control pill containing 35 micrograms of

17  estrogen. Increased levels of estrogen exposes women to a greater risk of serious side effects,

18  particularly blood clots in the legs and lungs, heart attacks and strokes.

19       74.     Ortho Evra was, and still continues to be, aggressively marketed as an easy to use,

20  safe, and effective alternative to oral contraceptives. Its main allure is in its convenience since

21  Ortho Evra only needs to be applied once a week, unlike oral contraceptive that need to be taken

22  daily to be effective.

23       75.     Defendant ORTHO-MCNEIL failed to appropriately warn Plaintiffs and

24  prescribing physicians of the serious risks of strokes, pulmonary emboli, blood clots, deep vein

25  thrombosis, and heart attacks, as well as other severe permanent health problems.

26       76.     Despite the higher levels of estrogen that are known to be released by Ortho Evra

27  and the blood clot warnings, the package insert states that "there is limited epidemiological data

28  available to determine whether safety with the transdermal route of administration is different

10

1    than the oral route". The package insert goes on to say that "the information contained in this

2    package insert is principally based on studies carried out in women who used combination **oral**

3    **contraceptives...**".

4        77.      Defendant ORTHO-MCNEIL knew, or should have known, about the above

5    mentioned risks based upon the state of knowledge of ORTHO-MCNEIL as it existed at that

6    time. Additionally, ORTHO-MCNEIL failed to properly or adequately investigate the safety

7    concerns of Ortho Evra.

8        78.      Defendant ORTHO-MCNEIL's conduct fell below the duty of care that was

9    owed by Defendants to Plaintiffs.

10       79.      Defendant ORTHO-MCNEIL misrepresented the known risks associated with

11    the use of Ortho Evra. ORTHO-MCNEIL also made claims with regards to the safe and

12    efficacious nature of their product in the prevention of pregnancy.

13       80.      Defendant ORTHO-MCNEIL negligently and recklessly failed to inform the

14    public, prescribing healthcare professionals and the FDA of the risks of strokes, pulmonary

15    emboli, blood clots, deep vein thrombosis, and heart attacks, as well as other severe permanent

16    health problems associated with use of their product, Ortho Evra.

17       81.      Defendant ORTHO-MCNEIL was careless and negligent in their manufacturing,

18    testing, selling, distributing, merchandising, advertising, promoting, packaging, and marketing of

19    Ortho Evra.

20       82.      By reason of the foregoing, Plaintiffs have suffered from strokes, pulmonary

21    emboli, blood clots, deep vein thrombosis, and heart attacks, as well as other severe permanent

22    health problems.

23                     **FRAUDULENT CONCEALMENT**

24       83.      Any applicable statute of limitations have been tolled by the knowing and active

25    concealment and denial of facts as alleged herein by the Defendants. Plaintiffs have been kept in

26    ignorance of vital information essential to the pursuit of these claims, without any fault or lack of

27    diligence on their part. Plaintiffs could not have reasonably discovered the dangerous nature and

28    unreasonable adverse side effects associated with Ortho Evra. As a result, Plaintiffs did not

11

---

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1  discover the facts giving rise to these claims until less than one year before the filing of this

2  Complaint.

3    84.    Defendants are and were under a continuing duty to disclose the true character,

4  quality and nature of the patch to Plaintiffs. Because of their concealment of the true character,

5  quality and nature of the contraceptive, Defendants are estopped from relying on any statute of

6  limitations defense.

7                    **FIRST CAUSE OF ACTION**
                          *Negligence*
8           (Against Defendants ORTHO-MCNEIL and MCKESSON)

9    85.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs of

10  this Complaint as though fully set forth in this paragraph.

11   86.    Defendants had a duty to exercise reasonable care in the manufacture, sale,

12  research, development, inspection, labeling, promoting, marketing, and/or distribution of Ortho

13  Evra into the stream of commerce, including a duty to assure that this patch did not cause users

14  to suffer from unreasonable, dangerous side effects.

15   87.    Defendants ORTHO-MCNEIL and MCKESSON failed to exercise ordinary care

16  in the manufacture, sale, testing, quality assurance, quality control, marketing and/or distribution

17  of Ortho Evra into interstate commerce, in that Defendants knew or should have known that

18  using Ortho Evra created a high risk of unreasonable dangerous side effects, including but not

19  limited to the risk of strokes, pulmonary emboli, blood clots, deep vein thrombosis, and heart

20  attacks, as well as other severe permanent health problems.

21   88.    Defendants ORTHO-MCNEIL and MCKESSON breached their duty to Plaintiffs

22  and were negligent in the licensing, testing, design, manufacture, packaging, warning,

23  advertising, promotion, distribution, and sale of Ortho Evra in that Defendants:

24        A.    Failed to use ordinary care in designing and manufacturing the Ortho Evra

25              so as to avoid the aforementioned risks to Plaintiffs;

26        B.    Failed to accompany Ortho Evra with proper warnings regarding the

27              possible adverse side effects associated with the use of the patch and the

28              comparative severity and duration of such adverse effects, i.e., the

                                    12
_____
**FIRST AMENDED COMPLAINT FOR DAMAGES**

1    warnings given did not accurately reflect the symptoms, scope or severity

2    of the side effects;

3    C.    Failed to conduct adequate pre-clinical testing and post-marketing

4    surveillance to determine the safety and side effects of Ortho Evra;

5    D.    Failed to provide adequate training to medical care providers for

6    appropriate use of Ortho Evra;

7    E.    Failed to warn Plaintiffs, either directly or indirectly, orally or in writing,

8    about the following:

9    (i)    The need for comprehensive, regular monitoring to ensure early

10    discovery of potentially serious side effects like blood clots, deep

11    vein thrombosis and pulmonary emboli;

12    (ii)    The possibility of becoming injured, disabled or dying as a result

13    of using Ortho Evra.

14    F.    Failed to adequately test and/or warn about the serious side effects of

15    Ortho Evra;

16    G.    Failed to include adequate warnings with Ortho Evra that would alert

17    Plaintiffs, physicians, hospitals, and clinics, to the potential risks and the

18    nature, scope, severity, and duration of any serious side effects of Ortho

19    Evra;

20    H.    Continued to promote the efficacy and safety of Ortho Evra while

21    providing little or no warnings, and downplaying any risks, even after

22    Defendants knew of the risks of serious injury and/or death;

23    I.    Delayed warnings of, and then failed to provide adequate warnings about

24    the serious injuries, which may have dissuaded medical providers from

25    prescribing Ortho Evra and deprived women of information so that they

26    can weigh the true risks against the benefits of prescribing Ortho Evra;

27    and

28    J.    Were otherwise careless or negligent.

13

**FIRST AMENDED COMPLAINT FOR DAMAGES**

89.     Despite the fact that Defendants knew or should have known that Ortho Evra caused unreasonably dangerous side effects, Defendants continued and are currently continuing to market, manufacture, distribute and/or sell Ortho Evra to consumers, including Plaintiffs and their doctors.

90.     Defendants knew or should have known that consumers, such as Plaintiffs, would suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

91.     Plaintiffs are entitled to punitive damages because the Defendants' failure to warn was reckless and without regard for the public's safety and welfare. The Defendants misled both the medical community and the public at large, including Plaintiffs, by making false representations about the safety of Ortho Evra. The Defendants downplayed, understated, and disregarded their knowledge of the serious side effects associated with the use of Ortho Evra despite available information demonstrating that their products were likely to cause serious and potentially fatal side effects to users like Plaintiffs.

92.     As a direct, proximate and legal result of the negligence, carelessness, other wrongdoing and actions of the Defendants described herein, Plaintiffs were, and/or still are, caused to suffer severe injuries including diminished enjoyment of life, strokes, pulmonary emboli, blood clots, deep vein thrombosis, and heart attacks, as well as other severe permanent health problems.

93.     Based upon information and belief, Defendants actually knew of Ortho Evra's defective nature, as set forth herein, but continued, and still continue, to design, manufacture, market and sell the patch so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiffs, in conscious disregard of the foreseeable harm caused by the patch.

94.     Defendants' conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution and sale of Ortho Evra constituted malice, oppression and fraud, including, but not limited to:

        A.     Aggressively marketing and promoting Ortho Evra, knowing the high risks posed by failing to conduct sufficient pre-clinical and clinical testing

14

1   and adequate post-marketing surveillance;

2  B.  Failing to include adequate warnings with Ortho Evra that would alert

3    consumers, physicians, hospitals, clinics, and other users to the potential

4    risks and the nature, scope, severity, and duration of any serious side

5    effects of the patch, particularly, strokes, pulmonary emboli, blood clots,

6    deep vein thrombosis, and heart attacks, as well as other severe permanent

7    health problems;

8  C.  Continuing to promote the efficacy and safety of the patch, while

9    providing little or no warnings, and downplaying any risks, even after

10    Defendants knew of the increased risks associated with use of Ortho Evra

11    as opposed to oral contraceptives;

12  D.  Delaying warnings of the dangerous side effects which may have

13    dissuaded medical providers from prescribing Ortho Evra so freely, and

14    depriving women of information so that they could weigh the true risks

15    against the benefits of using the patch, was fraudulent, knowing

16    misconduct, and/or conduct undertaken recklessly and with conscious

17    disregard for the safety of consumers such as the Plaintiffs, such as to

18    constitute despicable conduct, and oppression, fraud and malice, and such

19    conduct was at all times relevant ratified by the corporate Defendants

20    herein, thereby entitling Plaintiffs punitive damages in an amount

21    appropriate to punish and set an example of Defendant.

22  95.  As a result of ORTHO-MCNEIL and MCKESSON's conduct, Plaintiffs suffered

23 injuries and damages herein.

24  WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set

25 forth herein below.

**SECOND CAUSE OF ACTION**
*Strict Product Liability - Failure to Warn*
(Against Defendants ORTHO-MCNEIL and MCKESSON)

26

27

28  96.  Plaintiffs incorporate by reference the allegations in all proceeding paragraphs of

15

FIRST AMENDED COMPLAINT FOR DAMAGES

this Complaint as though fully set forth in this paragraph.

97.    Defendants ORTHO-MCNEIL and MCKESSON are the manufacturer and/or supplier of Ortho Evra.

98.    Ortho Evra manufactured and/or supplied by Defendants ORTHO-MCNEIL and MCKESSON was unaccompanied by proper warnings regarding all possible side effects associated with their use and the comparative severity, incidence, and duration of such adverse effects, i.e., the warnings given did not accurately reflect the signs, symptoms, incidence, scope or severity of the side effects.

99.    Defendants failed to perform adequate testing that would have shown that Ortho Evra possessed serious potential side effects with respect to which full and proper warnings accurately and fully reflecting symptoms, scope and severity should have been made, both with respect to the use of the patch.

100.    Ortho Evra manufactured and/or supplied by Defendants was defective due to inadequate post-marketing surveillance and/or warnings or instructions because, after the manufacturer knew or should have known of the risks of injury from Ortho Evra, they failed to provide adequate warnings to users or consumers of the patch and continued, and still continue, to aggressively promote Ortho Evra.

101.    Ortho Evra manufactured and/or supplied by Defendants was defective because Defendants were aware that the amount of estrogen that is released from the patch is much higher than the levels associated with oral contraceptives.

102.    As a direct, proximate and legal result of the negligence, carelessness, other wrongdoing and actions of Defendants described herein, Plaintiffs have been injured as described above.

103.    Based upon information and belief, Defendants actually knew of the defective nature of Ortho Evra, as set forth herein, but continued, and still continue, to design manufacture, market and sell Ortho Evra so as to maximize sales and profits at the expense of the health and safety of the public including Plaintiffs, in conscious disregard of the foreseeable harm caused by Ortho Evra.

16

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1     104.   Plaintiffs could not , by reasonable exercise of care, have discovered the defects

2 and dangers of Ortho Evra.

3     105.   Defendants conduct in the license, design, manufacturing, assembly, packaging,

4 warning, marketing, advertising, promotion, distribution, and sale of Ortho Evra constituted

5 malice, oppression and fraud, including, but not limited to:

6         A.     Aggressively marketing and promoting Ortho Evra, knowing the high

7                risks posed by failing to conduct sufficient pre-clinical and clinical testing

8                and adequate post-marketing surveillance;

9         B.     Failing to provide complete literature with regards to Ortho Evra, and

10               indicating the need for monitoring while on the patch;

11         C.     Failing to include adequate warnings with Ortho Evra that would alert

12               consumers, physicians, hospitals, clinics and other users to the potential

13               risks and the nature, scope, severity, and duration of any serious side

14               effects of the drug, particularly the risk of strokes, pulmonary emboli,

15               blood clots, deep vein thrombosis, and heart attacks, as well as other

16               severe permanent health problems;

17         D.     Continuing to promote the efficacy and safety of the drug, while providing

18               little or no warnings, and downplaying any risks, even after Defendants

19               knew of the increased risks associated with Ortho Evra use;

20         E.     Delaying warnings about the dangerous side effects which may have

21               dissuaded medical providers from prescribing Ortho Evra so freely, and

22               depriving women of information so that they could weigh the true risks

23               against the benefits of using the patch, was fraudulent, knowing

24               misconduct, and/or conduct undertaken recklessly and with conscious

25               disregard for the safety of consumers such as the Plaintiffs, such as to

26               constitute despicable conduct, fraud and malice, and such conduct was at

27               all times relevant ratified by corporate Defendants herein, thereby entitling

28               Plaintiffs to punitive damages in an amount appropriate to punish and set

17

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1    an example of Defendant.

2    106.   Defendants' actions, as described above, were performed willfully, intentionally,

3    and with reckless disregard for the rights of Plaintiffs and the public.

4    107.   As a result of Defendants' conduct, Plaintiffs have sustained injuries described

5    above.

6    108.   Accordingly, Plaintiffs seek and are entitled to compensatory and punitive

7    damages in an amount to be determined at trial.

8    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set

9    forth herein below.

10   ### THIRD CAUSE OF ACTION
     *Breach of Express Warranty*
11   (Against Defendants ORTHO-MCNEIL and MCKESSON)

12   109.   Plaintiffs incorporate by reference the allegations in all preceding paragraphs of

13   this Complaint as though fully set forth in this paragraph.

14   110.   Defendants, ORTHO-MCNEIL and MCKESSON, through description,

15   affirmation of fact, and promise relating to Ortho Evra, to the FDA, prescribing physicians, and

16   the general public, including Plaintiffs, expressly warranted that Ortho Evra was safe and well

17   accepted by users.

18   111.   Defendants, ORTHO-MCNEIL and MCKESSON further expressly warranted

19   that Ortho Evra did not produce any side effects in excess of those risks associated with oral

20   contraceptives, that the side effects were reflected accurately in the warnings, and that it was

21   accurately tested and fit for its intended use.

22   112.   Ortho Evra does not conform to these express representations because it is not

23   safe as its use produces serious adverse side effects including the risk of strokes, pulmonary

24   emboli, blood clots, deep vein thrombosis, and heart attacks, as well as other severe permanent

25   health problems.

26   113.   As such, Defendants' product was neither in conformity to the promises,

27   descriptions or affirmations of fact made about the patch nor adequately contained, packaged,

28   labeled or fit for the ordinary purposes for which such goods are used.

18

1    114.    Defendants knew or should have known that, in fact, said representations and

2 warranties were false and misleading in that Ortho Evra was not safe and/or fit for its intended

3 use, and in fact resulted in serious injuries to the user.

4    115.    Plaintiffs relied on the express warranties of the Defendants herein. Members of

5 the medical community, including physicians, and other healthcare professionals, relied upon the

6 representations and warranties of the Defendants for use of Ortho Evra in prescribing,

7 recommending, and/or dispensing the product.

8    116.    Defendants thereafter breached their express warranties to Plaintiffs by: (i)

9 manufacturing, marketing, packaging, labeling, and selling Ortho Evra to Plaintiffs in such a way

10 that misstated the risks of injury, without warning or disclosure thereof by package and label of

11 such risks to Plaintiffs or their prescribing physicians or pharmacists, or without so modifying or

12 excluding such express warranties; (ii) manufacturing, marketing, packaging, labeling, and

13 selling Ortho Evra to Plaintiffs, which failed to prevent pregnancy in a safe manner and without

14 injury; and (iii) manufacturing, marketing, packaging, labeling, and selling Ortho Evra to

15 Plaintiffs, thereby causing injury to each.

16    117.    As a direct and proximate result of Defendants' conduct the Plaintiffs were and

17 still are caused to suffer severe injuries and physical pain including diminished enjoyment of

18 life, strokes, pulmonary emboli, blood clots, deep vein thrombosis, and heart attacks, as well as

19 other severe permanent health problems.

20    118.    Plaintiffs are entitled to punitive damages because Defendants' failure to warn

21 was reckless and without regard to their welfare. Defendants misled both the medical community

22 and the public at large, including Plaintiffs, by making false representations about the safety of

23 their product. Defendants downplayed, understated, and disregarded their knowledge of the

24 serious side effects associated with the use of Ortho Evra, despite available information

25 demonstrating that it was likely to cause serious and sometimes fatal side effects to users.

26    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set

27 forth herein below.

28    **FOURTH CAUSE OF ACTION**
    *Breach of Implied Warranty*

19

**FIRST AMENDED COMPLAINT FOR DAMAGES**

(Against Defendants ORTHO-MCNEIL and MCKESSON)

119.  Plaintiffs incorporate by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth in this paragraph.

120.  At the time Defendants ORTHO-MCNEIL and MCKESSON marketed, sold, and distributed Ortho Evra, for use by Plaintiffs, Defendants knew of the use for which Ortho Evra was intended and impliedly warranted the patch to be of merchantable quality and safe and fit for its intended use.

121.  Defendants ORTHO-MCNEIL and MCKESSON impliedly represented and warranted to Plaintiffs, healthcare professionals and the FDA that the Ortha Evra it was supplying was safe and fit for ordinary use.

122.  Plaintiffs and members of the medical community relied on Defendants warranties that their product, Ortho Evra, was of merchantable quality and safe and fit for its intended use.

123.  Contrary to such implied warranties, Ortho Evra was not of merchantable quality or safe or fit for its intended use, because it was unreasonably dangerous and unfit for the ordinary purposes for which it was used, as described above.

124.  Defendant's conduct in the license, design, manufacturing, assembly, packaging, warning, marketing, advertising, promotion, distribution, and sale of Ortho Evra constituted malice, oppression and fraud, including but not limited to:

A.  Marketing and promoting the product aggressively, knowing the high risks posed by failing to conduct sufficient pre-clinical and clinical testing and adequate post-market surveillance;

B.  Failing to provide complete literature with regards to Ortho Evra and indicating the need for monitoring while on the patch;

C.  Failing to include adequate warnings with Ortho Evra that would alert consumers, physicians, hospitals, clinics and other users of the potential risks and the nature, scope, severity and duration of any serious side effects of the patch, particularly, the risks of strokes, pulmonary emboli,

20

1    blood clots, deep vein thrombosis, and heart attacks, as well as other

2    severe permanent health problems;

3    D.    Continuing to promote the efficacy and safety of Ortho Evra, while

4    providing little or no warnings, and downplaying any risks, even after the

5    Defendants knew of the increased risks associated with use of their

6    product;

7    E.    Delaying warnings of, and then failing to provide adequate warnings about

8    the dangerous side effects which may have dissuaded medical providers

9    from prescribing Ortho Evra so freely, and depriving women of

10    information so that they could weigh the true risks against the benefits of

11    prescribing the product, was fraudulent, knowing misconduct, and/or

12    conduct undertaken recklessly and with conscious disregard for the safety

13    of consumers like Plaintiffs, such as to constitute despicable conduct,

14    oppression, fraud and malice, and such conduct was at all times relevant

15    ratified by the corporate Defendants herein, thereby entitling Plaintiffs

16    punitive damages in an amount appropriate to punish and set an example

17    of the Defendants.

18    125.    As a direct, proximate and legal result of Defendants' negligence, carelessness

19    and other wrongdoing described herein, Plaintiffs have sustained severe injuries as described

20    above.

21    126.    Based upon information and belief, Defendants actually knew of Ortho Evra's

22    defective nature, as set forth herein, but continued to design, manufacture, market, and sell Ortho

23    Evra to maximize sales and profits at the expense of the health and safety of the public, including

24    Plaintiffs in conscious disregard of the foreseeable harm caused by the patch.

25    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set

26    forth herein below.

27    **FIFTH CAUSE OF ACTION**
*Negligent Misrepresentation*
28    (Against Defendants ORTHO-MCNEIL and MCKESSON)

21

**FIRST AMENDED COMPLAINT FOR DAMAGES**

1    127.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs of

2    this Complaint as though fully set forth in this paragraph.

3    128.    Defendants ORTHO-MCNEIL and MCKESSON, having undertaken to prepare,

4    design, research, develop, manufacture, inspect, label, market, promote, and sell Ortho Evra,

5    owed a duty to Plaintiffs and the medical community to provide them accurate and complete

6    information regarding this product.

7    129.    The Defendants' advertising program, by containing affirmative

8    misrepresentations and omissions, falsely and deceptively sought to create the image and

9    impression that the use of Ortho Evra was safe, and had no unacceptable side effects.

10    130.    On information and belief, Plaintiffs aver that Defendants failed to disclose,

11    misstated, downplayed, and understated the health hazards and risks associated with the use of

12    Ortho Evra. Defendants deceived potential users and prescribers of the patch by relaying only

13    allegedly positive information, while concealing, misstating and downplaying the known adverse

14    and serious health effects.

15    131.    Defendants knew or were aware or should have known or been aware that Ortho

16    Evra had been insufficiently tested and that it lacked necessary warnings. Defendants were or

17    should have been in possession of evidence demonstrating that their product created a high risk

18    of unreasonable, dangerous side effects, including but not limited to strokes, pulmonary emboli,

19    blood clots, deep vein thrombosis, and heart attacks, as well as other severe permanent health

20    problems. Nonetheless, Defendants continued to market Ortho Evra by providing false and

21    misleading information with regard to its safety and efficacy.

22    132.    Plaintiffs and their doctors justifiably relied to their detriment upon Defendants'

23    positive misrepresentations concerning Ortho Evra.

24    133.    As a result of Defendants' conduct, Plaintiffs have sustained injuries as described

25    above. Accordingly, Plaintiffs seek and are entitled to compensatory and punitive damages in an

26    amount to be determined at trial.

27    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them , as set

28    forth herein below.

22

**FIRST AMENDED COMPLAINT FOR DAMAGES**

## SIXTH CAUSE OF ACTION
### *Fraud*
(Against Defendants ORTHO-MCNEIL and MCKESSON)

134.    Plaintiffs incorporate by reference the allegations in all preceding paragraphs of this Complaint as though fully set forth in this paragraph.

135.    ORTHO-MCNEIL and MCKESSON, having undertaken to prepare, design, research, develop, manufacture, inspect, label, market, promote and sell Ortho Evra, owed and continue to owe a duty to provide accurate and complete information regarding their product.

136.    Defendant deceptively sought to create the image and impression that the use of Ortho Evra was just as safe as the oral contraceptives already on the market, and had no unacceptable side effects. by intentionally distributing false information to Plaintiffs, the general public, healthcare professionals and the FDA.

137.    On information and belief, Plaintiffs aver that the Defendants intentionally concealed, misstated, downplayed, suppressed, and ignored test results that were unfavorable to the Defendants as well as the results that revealed that Ortho Evra was not safe in the prevention of pregnancy. Defendants deceived potential users and prescribers of the patch by disseminating only allegedly positive information while concealing, misstating and downplaying the known adverse and serious health effects. Defendants falsely and deceptively kept relevant information from potential Ortho Evra users and minimized safety concerns.

138.    These representations were made with the purpose of deceiving and defrauding the public, the FDA and the Plaintiffs in order to gain their confidence and falsely ensure the quality and fitness of Ortho Evra.

139.    In representations made to Plaintiffs, physicians and the public in general, Defendants' fraudulently concealed and intentionally omitted information included, but not limited to the following:

A.    That Ortho Evra was not as safe as other forms of contraception;

B.    That the amount of estrogen Ortho Evra users are exposed to is much higher than the levels that oral contraceptive users are exposed to;

C.    The risk of adverse effects is more likely with Ortho Evra use because of

23

the higher levels of estrogen that the user is exposed to;

D.    That even after concerns about serious adverse effects were known, Ortho Evra was not adequately tested.

140.    Defendants were or should have been in possession of evidence demonstrating that their product caused serious side effects. Nevertheless, they continued to market Ortho Evra and represent falsely in their documents that Ortho Evra was safe and did not present any health risks above those associate with the oral contraceptives on the market.

141.    Defendants knew or should have known that the public, including the Plaintiffs would rely on the information that was being distributed.

142.    Plaintiffs did in fact rely on and believe Defendants' representations to be true and relied upon the representations, and were induced to purchase and use Ortho Evra. Plaintiffs did not discover the true facts with respect to the dangerous and serious side effects or the false representations that were made by Defendants, nor could the Plaintiffs have discovered the true facts with reasonable diligence.

143.    Had the Plaintiffs known of the true facts with respect to the dangerous and serious health risks of Ortho Evra, Plaintiffs would not have purchased or used Ortho Evra nor would they have relied on Defendants' false representations.

144.    Defendants concealment and omissions of material facts concerning the safety of Ortho Evra was made purposefully, wilfully, wantonly and/or recklessly, to mislead Plaintiffs, and their physicians into continued use and/or dispensing of Ortho Evra.

145.    Plaintiffs are entitled to punitive damages because the failure of the Defendants to warn was reckless and without regard for the public's safety and welfare. Defendants misled both the medical community and the general public, including the Plaintiffs, through false representations about the safety of Ortho Evra.

146.    The Defendants' actions, as described above, were performed willfully, intentionally, and with reckless disregard for the rights of Plaintiffs and the public.

147.    Accordingly, Plaintiffs seek and are entitled to compensatory and punitive damages in an amount to be determined at trial.

24

1    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as set

2  forth herein below.

3

4                                **PRAYER FOR RELIEF**

5    WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as

6  follows for:

7        1.      Costs of suit incurred herein;

8        2.      Special damages according to proof;

9        3.      General damages according to proof;

10       4.      Punitive or exemplary damages according to proof;

11       5.      Prejudgment interest on these losses;

12       6.      For such other and further relief as the Court deems just.

13  DATED: November 30, 2007                 KHORRAMI, POLLARD & ABIR, LLP

14

15

16                                 By: _____
                                          SHAWN KHORRAMI, ESQ.
17                                          Attorney for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

                                        25

1
2
3
## DEMAND FOR JURY TRIAL
4
Plaintiffs hereby demand a trial by jury in this action .

5   DATED: November 30, 2007                    KHORRAMI, POLLARD & ABIR, LLP
6
7                                               By: _____
8                                                    SHAWN KHORRAMI, ESQ.
                                                     Attorney for Plaintiffs
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIRST AMENDED COMPLAINT FOR DAMAGES**

CASE NUMBER: CGC-07-466704  MIRANDA ADAMS VS. ORTHO-MCNEIL PHARMACEUTICA

## NOTICE TO PLAINTIFF

A Case Management Conference is set for

DATE:    FEB-01-2008

TIME:    9:00AM

PLACE:   **Department 212**
         **400 McAllister Street**
         **San Francisco, CA  94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference.

However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed, served and lodged in Department 212 twenty-five (25) days before the case management

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state.

## ALTERNATIVE DISPUTE RESOLUTION POLICY REQUIREMENTS

IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE PARTICIPATE IN EITHER MEDIATION, JUDICIAL OR NON-JUDICIAL ARBITRATION, THE EARLY SETTLEMENT PROGRAM OR SOME SUITABLE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A MANDATORY SETTLEMENT CONFERENCE OR TRIAL. (SEE LOCAL RULE 4)

Plaintiff must serve a copy of the Alternative Dispute Resolution Information Package on each defendant along with the complaint. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the Alternative Dispute Resolution Information Package prior to filing the Case Management Statement.

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

Superior Court Alternative Dispute Resolution Coordinator
400  McAllister Street, Room 103
San Francisco, CA  94102
.(415) 551-3876

See Local Rules 3.6, 6.0 C and 10 D re stipulation to commissioners acting as temporary judges

# Alternative Dispute Resolution (ADR) Information Package

# Alternatives to Trial

# Here are some other ways to resolve a civil dispute.

The plaintiff must serve a copy of the ADR information package
on each defendant along with the complaint.  (CRC 201.9(c))

## Superior Court of California
## County of San Francisco

# Introduction

Did you know that most civil lawsuits settle without a trial?

And did you know that there are a number of ways to resolve civil disputes without having to sue somebody?

These alternatives to a lawsuit are known as alternative dispute resolutions (ADR). The most common forms of ADR are mediation, arbitration and case evaluation. There are a number of other kinds of ADR as well.

In ADR, trained, impartial persons decide disputes or help parties decide disputes themselves. These persons are called neutrals. For example, in mediation, the neutral is the mediator. Neutrals normally are chosen by the disputing parties or by the court. Neutrals can help parties resolve disputes without having to go to court.

ADR is not new. ADR is available in many communities through dispute resolution programs and private neutrals.

# Advantages of ADR

ADR can have a number of advantages over a lawsuit.

- *ADR can be speedier.* A dispute often can be resolved in a matter of months, even weeks, through ADR, while a lawsuit can take years.

- *ADR can save money.* Court costs, attorneys fees, and expert fees can be saved.

- *ADR can permit more participation.* The parties may have more chances to tell their side of the story than in court and may have more control over the outcome.

- *ADR can be flexible.* The parties can choose the ADR process that is best for them. For example, in mediation the parties may decide how to resolve their dispute.

- *ADR can be cooperative.* This means that the parties having a dispute may work together with the neutral to resolve the dispute and agree to a remedy that makes sense to them, rather than work against each other.

- *ADR can reduce stress.* There are fewer, if any, court appearances. And because ADR can be speedier, and save money, and because the parties are normally cooperative, ADR is easier on the nerves. The parties don't have a lawsuit hanging over their heads for years.

- *ADR can be more satisfying.* For all the above reasons, many people have reported a high degree of satisfaction with ADR.

Because of these advantages, many parties choose ADR to resolve a dispute, instead of filing a lawsuit. Even when a lawsuit has been filed, the court can refer the dispute to a neutral before the parties' position harden and the lawsuit becomes costly. ADR has been used to resolve disputes even after a trial, when the result is appealed.

# Disadvantages of ADR

ADR may not be suitable for every dispute.

- If ADR is binding, the parties normally give up most court protections, including a decision by a judge or jury under formal rules of evidence and procedure, and review for legal error by an appellate court.

- There generally is less opportunity to find out about the other side's case with ADR than with litigation. ADR may not be effective if it takes place before the parties have sufficient information to resolve the dispute.

- The neutral may charge a fee for his or her services.

- If a dispute is not resolved through ADR, the parties may have to put time and money into both ADR and a lawsuit.

- Lawsuits must be brought within specified periods of time, known as statutes of limitation. Parties must be careful not to let a statute of limitations run out while a dispute is in an ADR process.

# ALTERNATIVE DISPUTE RESOLUTION PROGRAMS
## Of the San Francisco Superior Court

"It is the policy of the Superior Court that every noncriminal, nonjuvenile case participate either in an early settlement conference, mediation, arbitration, early neutral evaluation or some other alternative dispute resolution process prior to a mandatory settlement conference or trial." (Superior Court Local Rule 4)

This guide is designed to assist attorneys, their clients and self-represented litigants in complying with San Francisco Superior Court's alternative dispute resolution ("ADR") policy. Attorneys are encouraged to share this guide with clients. By making informed choices about dispute resolution alternatives, attorneys, their clients and self-represented litigants may achieve a more satisfying resolution of civil disputes.

The San Francisco Superior Court currently offers three ADR programs for civil matters; each program is described below:

1) Judicial arbitration
2) Mediation
3) The Early Settlement Program (ESP) in conjunction with the San Francisco Bar Association.

## JUDICIAL ARBITRATION

### Description

In arbitration, a neutral "arbitrator" presides at a hearing where the parties present evidence through exhibits and testimony. The arbitrator applies the law to the facts of the case and makes an award based upon the merits of the case. When the Court orders a case to arbitration it is called <u>judicial arbitration</u>. The goal of arbitration is to provide parties with an adjudication that is earlier, faster, less formal, and usually less expensive than a trial. Upon stipulation of all parties, other civil matters may be submitted to judicial arbitration.

Although not currently a part of the Court's ADR program, civil disputes may also be resolved through <u>private arbitration</u>. Here, the parties

voluntarily consent to arbitration. If all parties agree, private arbitration may be binding and the parties give up the right to judicial review of the arbitrator's decision. In private arbitration, the parties select a private arbitrator and are responsible for paying the arbitrator's fees.

## Operation

Pursuant to CCP 1141.11 and Local Rule 4, all civil actions in which the amount in controversy is $50,000 or less, and no party seeks equitable relief, shall be ordered to arbitration. A case is ordered to arbitration after the Case Management Conference. An arbitrator is chosen from the Court's Arbitration Panel. Most cases ordered to arbitration are also ordered to a pre-arbitration settlement conference. Arbitrations are generally held between 7 and 9 months after a complaint has been filed. Judicial arbitration is not binding unless all parties agree to be bound by the arbitrator's decision. Any party may request a court trial within 30 days after the arbitrator's award has been filed.

## Cost

There is no cost to the parties for judicial arbitration or for the pre-arbitration settlement conference.

## MEDIATION

## Description

Mediation is a voluntary, flexible, and confidential process in which a neutral third party "mediator" facilitates negotiations. The goal of mediation is to reach a mutually satisfactory agreement that resolves all or part of the dispute after exploring the significant interests, needs, and priorities of the parties in light of relevant evidence and the law.

Although there are different styles and approaches to mediation, most mediations begin with presentations of each side's view of the case. The mediator's role is to assist the parties in communicating with each other, expressing their interests, understanding the interests of opposing parties, recognizing areas of agreement and generating options for resolution. Through questions, the mediator aids each party in assessing the strengths and weaknesses of their position.

A mediator does not propose a judgment or provide an evaluation of the merits and value of the case. Many attorneys and litigants find that mediation's emphasis on cooperative dispute resolution produces more satisfactory and enduring resolutions. Mediation's non-adversarial approach is particularly effective in disputes in which the parties have a continuing relationship, where there are multiple parties, where equitable relief is sought, or where strong personal feelings exist.

## Operation

San Francisco Superior Court Local Court Rule 4 **provides three different voluntary mediation programs** for civil disputes. An appropriate program is available for all civil cases, regardless of the type of action or type of relief sought.

To help litigants and attorneys identify qualified mediators, the Superior Court maintains a list of mediation providers whose training and experience have been reviewed and approved by the Court. The list of court approved mediation providers can be found at www.sfgov.org/courts. Litigants are not limited to mediators on the court list and may select any mediator agreed upon by all parties. A mediation provider need not be an attorney.

Local Rule 4.2 D allows for mediation in lieu of judicial arbitration, so long as the parties file a stipulation to mediate within 240 days from the date the complaint is filed. If settlement is not reached through mediation, a case proceeds to trial as scheduled.

## Private Mediation

The Private Mediation program accommodates cases that wish to participate in private mediation to fulfill the court's alternative dispute resolution requirement. The parties select a mediator, panel of mediators or mediation program of their choice to conduct the mediation. The cost of mediation is borne by the parties equally unless the parties agree otherwise.

Parties in civil cases that have not been ordered to arbitration may consent to private mediation at any point before trial. Parties willing to submit a matter to private mediation should indicate this preference on the Stipulation to Alternative Dispute Resolution form or the Case Management Statement (CM-110). Both forms are attached to this packet.

## *Mediation Services of the Bar Association of San Francisco*

The Mediation Services is a coordinated effort of the San Francisco Superior Court and The Bar Association of San Francisco (BASF) in which a court approved mediator provides three hours of mediation at no charge to the parties. It is designed to afford civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint, in an effort to resolve the matter before substantial funds are expended on the litigation process. Although the goal of the program is to provide the service at the outset of the litigation, the program may be utilized at anytime throughout the litigation process.

The mediators participating in the program have been pre-approved by the court pursuant to strict educational and experience requirements.

After the filing of the signed Stipulation to Alternative Dispute Resolution form included in this ADR package the parties will be contacted by BASF. Upon payment of the $200 per party administration fee, parties select a specific mediator from the list of court approved mediation providers. The hourly mediator fee beyond the first three hours will vary depending on the mediator selected. Waiver of the administrative fee based on financial hardship is available.

A copy of the Mediation Services rules can be found on the BASF website at www.sfbar.org, or you may call BASF at 415-782-8913

## *Judicial Mediation*

The Judicial Mediation program is designed to provide early mediation of complex cases by volunteer judges of the San Francisco Superior Court. Cases considered for the program include construction defect, employment discrimination, professional malpractice, insurance coverage, toxic torts and industrial accidents.

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will coordinate assignment of cases that qualify for the program.

ADR-1  1/06 (bc)

## Cost

Generally, the cost of Private Mediation ranges from $200 per hour to $400 per hour and is shared equally by the parties. Many mediators are willing to adjust their fees depending upon the income and resources of the parties. Any party who meets certain eligibility requirements may ask the court to appoint a mediator to serve at no cost to the parties.

The Mediation Services of the Bar Association of San Francisco provides three hours of mediation time at no cost with a $200 per party administrative fee.

There is no charge for participation in the Judicial Mediation program.

## EARLY SETTLEMENT PROGRAM

### Description

The Bar Association of San Francisco, in cooperation with the Court, offers an Early Settlement Program ("ESP") as part of the Court's settlement conference calendar. The goal of early settlement is to provide participants an opportunity to reach a mutually acceptable settlement that resolves all or part of the dispute. The two-member volunteer attorney panel reflects a balance between plaintiff and defense attorneys with at least 10 years of trial experience.

As in mediation, there is no set format for the settlement conference. A conference typically begins with a brief meeting with all parties and counsel, in which each is given an opportunity to make an initial statement. The panelists then assist the parties in understanding and candidly discussing the strengths and weaknesses of the case. The Early Settlement Conference is considered a "quasi-judicial" proceeding and, therefore, is not entitled to the statutory confidentiality protections afforded to mediation.

### Operation

Civil cases enter the ESP either voluntarily or through assignment by the Court. Parties who wish to choose the early settlement process should indicate this preference on the status and setting conference statement.

If a matter is assigned to the ESP by the Court, parties may consult the ESP program materials accompanying the "Notice of the Early Settlement Conference" for information regarding removal from the program.

Participants are notified of their ESP conference date approximately 4 months prior to trial. The settlement conference is typically held 2 to 3 months prior to the trial date. The Bar Association's ESP Coordinator informs the participants of names of the panel members and location of the settlement conference approximately 2 weeks prior to the conference date.

Local Rule 4.3 sets out the requirements of the ESP. All parties to a case assigned to the ESP are required to submit a settlement conference statement prior to the conference. All parties, attorneys who will try the case, and insurance representatives with settlement authority are required to attend the settlement conference. If settlement is not reached through the conference, the case proceeds to trial as scheduled.

**Cost**

All parties must submit a $200 generally non-refundable administrative fee to the Bar Association of San Francisco. Parties who meet certain eligibility requirements may request a fee waiver. For more information, please contact the ESP Coordinator at (415) 982-1600.

* * * * * * * * * * * * * * * * * * * *

For further information about San Francisco Superior Court ADR programs or dispute resolution alternatives, please contact:

Superior Court Alternative Dispute Resolution Coordinator,
400 McAllister Street, Room 103
San Francisco, CA  94102
(415) 551-3876

or visit the Superior Court Website at
http://sfgov.org/site/courts_page.asp?id=3672

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF SAN FRANCISCO
400 McAllister Street, San Francisco, CA  94102-4514

|  |  |
|---|---|
| Plaintiff<br><br>v.<br><br>Defendant | Case No. _____<br><br>**STIPULATION TO ALTERNATIVE<br>DISPUTE RESOLUTION** |

   The parties hereby stipulate that this action shall be submitted to the following alternative dispute resolution process:

☐ Private Mediation          ☐ **Mediation Services of BASF**     ☐ **Judicial Mediation**
☐ Binding arbitration                                          Judge _____
☐ Non-binding judicial arbitration                              Judge _____
☐ BASF Early Settlement Program
☐ Other ADR process (describe) _____

   **Plaintiff(s) and Defendant(s) further agree as follows:**

_____

_____

_____

_____

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

| Name of Party Stipulating | Name of Party or Attorney Executing Stipulation | Signature of Party or Attorney |
|---|---|---|
| ☐ Plaintiff  ☐ Defendant  ☐ Cross-defendant | | Dated: _____ |

☐ *Additional signature(s) attached*

ADR-2  3/06                      **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION**

CM-110

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*:<br><br><br><br>TELEPHONE NO.:                    FAX NO. *(Optional)*:<br>E-MAIL ADDRESS *(Optional)*:<br>ATTORNEY FOR *(Name)*: | FOR COURT USE ONLY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
  STREET ADDRESS:
  MAILING ADDRESS:
  CITY AND ZIP CODE:
  BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| | |
|---|---|
| **CASE MANAGEMENT STATEMENT**<br>**(Check one):**  ☐ **UNLIMITED CASE**   ☐ **LIMITED CASE**<br>        (Amount demanded      (Amount demanded is $25,000<br>        exceeds $25,000)          or less) | CASE NUMBER: |

A CASE MANAGEMENT CONFERENCE is scheduled as follows:

Date:                    Time:              Dept.:              Div.:              Room:

Address of court *(if different from the address above)*:

INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.

1. **Party or parties** *(answer one)*:
   a. ☐ This statement is submitted by party *(name)*:
   b. ☐ This statement is submitted jointly by parties *(names)*:

2. **Complaint and cross-complaint** *(to be answered by plaintiffs and cross-complainants only)*
   a.  The complaint was filed on *(date)*:
   b. ☐ The cross-complaint, if any, was filed on *(date)*:

3. **Service** *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
      (1) ☐ have not been served *(specify names and explain why not)*:
      (2) ☐ have been served but have not appeared and have not been dismissed *(specify names)*:
      (3) ☐ have had a default entered against them *(specify names)*:
   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served)*:

4. **Description of case**
   a.  Type of case in ☐ complaint ☐ cross-complaint    .*(describe, including causes of action)*:

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4.  b.   Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date [indicate source and amount], estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐   *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5.   **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial   *(if more than one party, provide the name of each party requesting a jury trial):*

6.   **Trial date**
a.  ☐   The trial has been set for *(date):*
b.  ☐   No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

c.   Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability).*

7.   **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
a.  ☐   days *(specify number):*
b.  ☐   hours (short causes) *(specify):*

8.   **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
a.   Attorney:
b.   Firm:
c.   Address:
d.   Telephone number:
e.   Fax number:
f.   E-mail address:
g.   Party represented:
☐   Additional representation is described in Attachment 8.

9.   **Preference**
☐   This case is entitled to preference *(specify code section):*

10.  **Alternative Dispute Resolution (ADR)**
a.   Counsel ☐ has ☐ has not   provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
b.  ☐   All parties have agreed to a form of ADR. ADR will be completed by *(date):*
c.   ☐   The case has gone to an ADR process *(indicate status):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d.   The party or parties are willing to participate in *(check all that apply):*
      (1) ☐ Mediation
      (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
      (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
      (4) ☐ Binding judicial arbitration
      (5) ☐ Binding private arbitration
      (6) ☐ Neutral case evaluation
      (7) ☐ Other *(specify):*

  e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
  f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
  g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

**11. Settlement conference**
  ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

**12. Insurance**
  a ☐ Insurance carrier, if any, for party filing this statement *(name):*
  b Reservation of rights: ☐ Yes ☐ No
  c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

**13. Jurisdiction**
Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
☐ Bankruptcy ☐ Other *(specify):*
Status:

**14. Related cases, consolidation, and coordination**
  a. ☐ There are companion, underlying, or related cases.
     (1) Name of case:
     (2) Name of court:
     (3) Case number:
     (4) Status:
    ☐ Additional cases are described in Attachment 14a.
  b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

**15. Bifurcation**
  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

**16. Other motions**
  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

**17. Discovery**

a. ☐ The party or parties have completed all discovery.

b. ☐ The following discovery will be completed by the date specified *(describe all anticipated discovery)*:

| Party | Description | Date |
|---|---|---|

c. ☐ The following discovery issues are anticipated *(specify)*:

**18. Economic Litigation**

a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.

b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed *(if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case)*:

**19. Other issues**

☐ The party or parties request that the following additional matters be considered or determined at the case management conference *(specify)*:

**20. Meet and confer**

a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court *(if not, explain)*:

b. After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following *(specify)*:

**21. Case management orders**

Previous case management orders in this case are *(check one)*:    ☐ none    ☐ attached as Attachment 21.

**22.** Total number of pages attached *(if any)*: _____

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____          ►  _____
(TYPE OR PRINT NAME)                                                          (SIGNATURE OF PARTY OR ATTORNEY)

_____          ►  _____
(TYPE OR PRINT NAME)                                                          (SIGNATURE OF PARTY OR ATTORNEY)

                                                                              ☐ Additional signatures are attached



# Superior Court of California
## County of San Francisco

## Judicial Mediation Program

Introducing a new court alternative dispute resolution
program that provides judicial mediation of complex civil cases

The Judicial Mediation program offers mediation of complex civil litigation by a San Francisco Superior Court judge familiar with the area of the law that is the subject of the controversy. Cases that will be considered for participation in the program include, but are not limited to professional malpractice, construction, employment, insurance coverage disputes, mass torts and complex commercial litigation. Judicial mediation offers civil litigants the opportunity to engage in early mediation of a case shortly after filing the complaint in an effort to resolve the matter before substantial funds are expended. This program may also be utilized at anytime throughout the litigation process. The panel of judges currently participating in the program includes:

| | |
|---|---|
| The Honorable David L. Ballati | The Honorable Tomar Mason |
| The Honorable Anne Bouliane | The Honorable James J. McBride |
| The Honorable Ellen Chaitin | The Honorable Kevin M. McCarthy |
| The Honorable John J. Conway | The Honorable John E. Munter |
| The Honorable Robert L. Dondero | The Honorable Ronald Evans Quidachay |
| The Honorable Ernest H. Goldsmith | The Honorable A. James Robertson, II |
| The Honorable Curtis E. A. Karnow | The Honorable Mary E. Wiss |
| The Honorable Patrick J. Mahoney | |

Parties interested in judicial mediation should file the Stipulation to Alternative Dispute Resolution form attached to this packet indicating a joint request for inclusion in the program and deliver a courtesy copy to Dept. 212. A preference for a specific judge may be indicated. The court Alternative Dispute Resolution Coordinator will facilitate assignment of cases that qualify for the program.

Note: Space is limited. Submission of a stipulation to judicial mediation does not guarantee inclusion in the program. You will receive written notification from the court as to the outcome of your application.

Superior Court Alternative Dispute Resolution
400 McAllister Street, Room 103, San Francisco, CA 94102
(415) 551-3876

**EXHIBIT B**



1  CHARLES F. PREUSS (State Bar No. 45783)
2  BRENDA N. BUONAITO (State Bar No. 173919)
   DRINKER BIDDLE & REATH LLP
3  50 Fremont Street, 20th Floor
   San Francisco, California 94105
4  Telephone: (415) 591-7500
   Facsimile: (415) 591-7510
5
   Attorneys for Defendants
6  ORTHO-MCNEIL PHARMACEUTICAL, INC.
   and MCKESSON CORPORATION
7
8
9              UNITED STATES DISTRICT COURT
10             NORTHERN DISTRICT OF CALIFORNIA
               SAN FRANCISCO DIVISION
11
   THERESA ABEL, an individual; LISA C.    Case No.
12 ALEXANDER, an individual; LISA
   ALEXANDER, an individual; NATALIE       C 06 7551
13 AMBROSE, an individual; NAOMI
   ANDERSON, an individual; RONNIE         DECLARATION OF GREG YONKO IN
14 BANKS, an individual; JENNIFER          SUPPORT OF NOTICE OF REMOVAL
   BARNES, an individual; SHANANE          AND REMOVAL OF ACTION UNDER
15 BARROW, an individual; ANDREA           28 U.S.C. § 1441(b) [DIVERSITY]
   BREVARD, an individual; MONICA
16 BROWN, an individual; ELIZABETH
   BROXTERMAN, an individual; REGIN
17 BRYANT, an individual; LAUREN
   BUCHANON, an individual; LINDA
18 CHAMPION, an individual; O'NESCIAN
   CLINTON, an individual; RODRINA
19 COLLIER, an individual; DENA COMER,
   an individual; LORI CROSS, an individual;
20 KIMBERLY EARLES, an individual;
   APRIL FIELDER, an individual; MARY
21 FREY, an individual; SHERRIE GROVE,
   an individual; HOLLY HALE, an
22 individual; AUDDRETTA HARRISON, an
   individual; TANESHA KING, an
23 individual; VERONICA LIPSCOMB, an
   individual; LYNNELL LUMPKINS, an
24 individual; GABRIELA MENA, an
   individual; EBONI MITCHELL, an
25 individual; ROCHELLE MORRIS, an
   individual; LATANGELA NEWSOME, an
26 individual; DESHA NICKERSON, an
   individual; SANDRA NORMAN, an
27 individual; ISABELLA PARKER, an
   individual; SUZETTE RAMIREZ, an
28 individual; MONIQUE REED, an

DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

SF1/317676v1

DECLARATION OF GREG YONKO  IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL  CASE NO.

1  individual; GENEVIEVE RENFRO, an
   individual; JENNIFER ROUSE, an
2  individual; ELIZABETH SMITH, an
   individual; TIJUANA STEWART-MARK,
3  an individual; LATOSHA UNDERWOOD,
   an individual; COSONDA WEAVER, an
4  individual; SAMANTHA WINCHESTER,
   an individual;
5
6                    Plaintiffs,
7           v.
8  ORTHO-MCNEIL PHARMACEUTICAL,
   INC., a Delaware Corporation;
9  MCKESSON CORP. and DOES 1-500,
   inclusive,
10
                     Defendants.
11
12     I, GREG YONKO, declare:

13     1.     I am Senior Vice President - Purchasing for McKesson Corporation

14  ("McKesson"). I make this Declaration based on my personal knowledge and/or

15  information assembled by employees of McKesson, which I am informed and believe to

16  be true. I would and could competently testify to the matters stated in this Declaration if

    called as a witness.
17
       2.     McKesson was and is a Delaware corporation, with its principal place of
18
    business in San Francisco, California.
19
       3.     McKesson was served with the Summons and Complaint in this action on
20
    November 15, 2006.
21
       4.     McKesson consents to the removal of this action.
22
       5.     McKesson had no involvement in the development or preparation of the
23
    prescribing information for Ortho Evra® and did not have any responsibility for the
24
    content of other written warnings concerning Ortho Evra®.
25
       6.     At no time has McKesson had any involvement with the manufacture,
26
    development, or testing of Ortho Evra®.
27
       7.     At no time has McKesson had any involvement with the packaging,
28

DECLARATION OF GREG YONKO IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL  Case No.

1  labeling, advertising, promotion, or marketing of Ortho Evra®.

2      I declare under penalty of perjury under the laws of the United States of America that

3  the foregoing is true and correct. Executed on December 6 2006, in San Francisco,

4  California.

5

6  GREG YONKO

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Drinker Biddle & Reath LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105

DECLARATION OF GREG YONKO IN SUPPORT OF NOTICE OF REMOVAL AND REMOVAL  CASE NO.

# EXHIBIT C

FILED _____ ENTERED
_____ LODGED _____ RECEIVED

NOV 27 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY_____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: PHENYLPROPANOLAMINE
(PPA) PRODUCTS LIABILITY
LITIGATION,

MDL NO. 1407

ORDER DENYING PLAINTIFF'S
MOTION TO REMAND

This document relates to:

Barnett, et al. v. American
Home Products Corp., et al.,
NO. C02-423R

1   THIS MATTER comes before the court on the motion of plain-
2  tiffs to remand the case to state court in Mississippi.  Having
3  reviewed the papers filed in support of and in opposition to this
4  motion, the court rules as follows:

5                           I.  BACKGROUND

6       Plaintiffs purchased a variety of over-the-counter drugs
7  including, but not limited to, products sold under the trade
8  names "Robitussin," "Alka-Seltzer Plus," "Dimetapp," "Tavist D,"
9  "BC," "Triaminic," "Contac," "Comtrex," and "Equate Tussin CF."
10 All of these products contained the ingredient phenylpro-
11 panolamine ("PPA").  The individuals later consumed the medica-
12 tion and suffered unidentified types of injuries.  In June 2001,
13 plaintiffs filed an amended complaint in Mississippi state court
14 linking the PPA in the medicine with the injuries sustained.

ORDER
Page - 1 -

43

1  The complaint alleges numerous causes of action against both
2  manufacturers and distributors of PPA-containing products, as
3  well as several retail stores that sold those products. One of
4  the stores named as a defendant, Bill's Dollar Stores, Inc.,
5  d/b/a Bill's Dollar Store ("Bill's Dollar Store"), is a Missis-
6  sippi corporation. Two of the six total plaintiffs purchased
7  PPA-containing products from Bill's Dollar Store.[1]
8  Defendants removed the complaint to federal court alleging
9  that plaintiffs fraudulently joined Bill's Dollar Store. Plain-
10 tiffs moved to remand to state court. The case was later trans-
11 ferred to this court as part of a multi-district litigation
12 ("MDL").

13          II. ANALYSIS
14  A plaintiff cannot defeat federal jurisdiction by fraudu-
15 lently joining a non-diverse party. As an MDL court sitting in
16 the Ninth Circuit, this court applies the Ninth Circuit's fraudu-
17 lent joinder standard to the motion to remand. See, e.g., In re
18 Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414, 423 (E.D.
19 Pa. 2002); In re Bridgestone/Firestone, 204 F. Supp. 2d 1149,
20 1152 n.2 (S.D. Ind. 2002); In re Tobacco/Gov'tal Health Care
21 Costs Litig., 100 F. Supp. 2d 31, 34 n.1 (D. D.C. 2000); In re /
22

23 [1] Defendants assert the misjoinder of these plaintiffs'
24 claims and request that the court sever and deny remand as to the
   four plaintiffs who did not purchase any products from Bill's
25 Dollar Store, or from any other Mississippi store. However,
   because, as discussed below, the court denies remand as to all
26 plaintiffs named in this action, the court need not address the
   question of misjoinder at this time.

ORDER
Page - 2 -

1  Ford Motor Co. Bronco II Prods. Liab. Litig., MDL-991, 1996 U.S.
2  Dist. LEXIS 6769, at *2-4 (E.D. La. May 16, 1996).[2] Under this
3  standard, joinder of a non-diverse party is deemed fraudulent
4  "'[i]f the plaintiff fails to state a cause of action against a
5  resident defendant, and the failure is obvious according to the
6  settled rules of the state.'" Morris v. Princess Cruises, Inc.,
7  236 F.3d 1061, 1067 (9th Cir. 2001) (quoting McCabe v. General
8  Foods Corp., 811 F.2d 1336, 1339 (9th Cir. 1987)).[3]
9        The propriety of removal to federal court is determined from
10  the allegations in the complaint at the time of removal. See
11  Ritchey v. Upjohn Drug Co., 139 F.3d 1313, 1318 (9th Cir. 1998)
12  However, in the case of fraudulent joinder, the defendant "'is
13  entitled to present the facts showing the joinder to be fraudu-
14  lent.'" Id. (quoting McCabe, 811 F.2d at 1339). See also Morris

15  [2] See generally Nanovitz v. Brown, 991 F.2d 36, 40-41 (2d
16  Cir. 1993); In Re Korean Airlines Disaster, 829 F.2d 1171, 1174-
17  76 (D.C. Cir. 1987).

18  [3] However, as a practical matter, application of the Fifth
19  Circuit's fraudulent joinder standard would not alter the court's
20  conclusion. See Badon v. RJR Nabisco, Inc., 224 F.3d 382, 393
    (5th Cir. 2000) (remand is denied where there is "no reasonable
21  basis for predicting that plaintiffs might establish liability
    . . against the in-state defendants."). For example, recent MDL
22  courts utilized fraudulent joinder standards similar, and in one
    case identical, to the Fifth Circuit's standard in deeming
23  Mississippi pharmacies and their employees fraudulently joined
    for reasons similar to those expressed in this opinion. See In
24  re Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d at 423-24
    (noting that there had been "a pattern of pharmacies being named
25  in complaints, but never pursued to judgment, typically being
    voluntarily dismissed at some point after the defendants' ability
26  to remove the case has expired"); In re Rezulin Prods. Liab.
    Litig., 133 F. Supp. 2d 272, 279 & n.3, 288-92 (S.D.N.Y. 2001).

ORDER
Page - 3 -

1   236 F.3d at 1067-68 (citing <u>Cavallini v. State Farm Mut. Auto.</u>

2   <u>Ins. Co.</u>, 44 F.3d 256, 263 (5th Cir. 1995) for the proposition

3   that the court may "'pierc[e] the pleadings'" and consider

4   "summary judgment-type evidence.")

5       Defendants allege that plaintiffs fraudulently joined Bill's

6   Dollar Store, while plaintiffs claim the existence of legitimate

7   causes of action against Bill's Dollar Store, including products

8   liability, negligence, misrepresentation, and implied warranty

9   claims. The parties also argue as to the relevance of a bank-

10   ruptcy petition filed by Bill's Dollar Store prior to the filing

11   of this suit.

12   A.     <u>Products Liability</u>

13       The complaint contains failure to warn and design defect

14   allegations pursuant to the Mississippi Products Liability Act,

15   Miss. Code Ann. § 11-1-63. Under the Products Liability Act,

16   plaintiff must show that at the time the product left the control

17   of the manufacturer or seller, it was defective in failing to

18   contain adequate warnings or instructions, and/or was designed in

19   a defective manner. Miss. Code Ann. § 11-1-63 (a)(i)(2)-(3).

20   Plaintiff must also show that the manufacturers and sellers knew,

21   or in light of reasonably available knowledge or the exercise of

22   reasonable care should have known, about the danger that caused

23   the alleged damage. Miss. Code Ann. § 11-1-63 (c)(i),(f)(i).[4]

24

25     [4]<u>See also Huff v. Shopsmith, Inc.</u>, 786 So.2d 383, 387 (Miss.
      2001)("With the adoption of 11-1-63, common law strict liability,
26     as laid out in <u>State Stove Mfg. Co. v. Hodges</u>, 189 So.2d 113

ORDER
Page - 4 -

1   Plaintiffs allege in the complaint that "defendants" or "all
2   defendants" knew or should have known of dangers associated with
3   PPA.  Moreover, plaintiffs specifically aver this knowledge or
4   reason to know on the part of the retailer defendants, including
5   Bill's Dollar Store.  However, the court finds that no factual
6   basis can be drawn from the complaint that Bill's Dollar Store
7   had knowledge or reason to know of any dangers allegedly associ-
8   ated with PPA.

9       First, the complaint utilizes the plural "defendants" in a
10  number of allegations that one could not reasonably interpret to
11  include Bill's Dollar Store.  See, e.g., Louis v. Wyeth-Ayerst
12  Pharm., Inc., No. 5:00CV102LN, slip op. at 5-9 (S.D. Miss. Sep.
13  25, 2000) (finding products liability allegations lodged against
14  "defendants" conclusory where there was no factual support for
15  conclusion that Mississippi pharmacies had knowledge or reason to
16  know of alleged dangers associated with various diet drugs).[8]
17  ─────────────
18  (Miss. 1966), is no longer the authority on the necessary
    elements of a products liability action.").
19
20      [8] See also In re Diet Drugs Prods. Liab. Litig., 220 F. Supp.
    2d at 424 (finding complaints, including failure to warn,
21  negligence, breach of warranty, and strict liability claims,
    devoid of specific allegations against Mississippi pharmacies and
22  "filled instead with general statements levied against all
    defendants, which most properly can be read as stating claims
23  against drug manufacturers."); In re Rezulin Products Liab.
    Litig., 133 F. Supp. 2d at 291 (finding improper joinder in case
24  where Mississippi pharmacies were lumped in with manufacturers
    and acts alleged, including failure to warn, breach of warranty,
25  and fraud, were attributed to "defendants' generally", but
    never connected to the pharmacies); accord Baden, 224 F.3d at
26  391-93 ("While the amended complaint does often use the word

    ORDER
    Page - 5 -

1  For example, the complaint describes "defendants" as members of
2  the Non-Prescription Drug Manufacturers Association ("NDMA").
3  Through this association, "defendants" purportedly participated
4  in numerous discussions relating to the safety of PPA over the
5  past two decades, had representatives sit on the NDMA PPA Task
6  Force, and funded relevant studies.  In other words, plaintiffs,
7  in significant part, demonstrate "defendants'" knowledge as to
8  risks allegedly posed by PPA through activities engaged in by
9  manufacturer defendants alone.

10    Indeed, while "defendants" are alleged to have been aware of
11  to have had responsibility for awareness of numerous scientific
12  journal articles, incident reports, medical textbooks, and other
13  reports containing information as to risks of PPA consumption,
14  general medical practitioners are excluded from this awareness
15  and described as being not "fully informed."  The complaint
16  supplies no factual support for a conclusion that a dollar store
17  possessed medical and scientific knowledge beyond that possessed
18  by medical practitioners.

19    Second, the complaint specifically lays the responsibility
20  for allegedly concealing dangers posed by PPA on the manufacturer
21  defendants.  For example, the complaint alleges that the manufac-
22  turer defendants concealed material facts regarding PPA through
23  product packaging, labeling, advertising, promotional campaigns
24

25  "defendants," frequently it is evident that such usage could not
    be referring to the "Tobacco Wholesalers."; finding conspiracy
26  allegations against Louisiana defendants entirely general).

ORDER
Page - 6 -

1  and materials, and other methods. This allegation directly
2  undermines and contradicts the idea that Bill's Dollar Store had
3  knowledge or reason to know of alleged defects. See, e.g.,
4  *Louis*, slip op. at 4-5 (finding complaint's "major theme" to
5  consist of the "manufacturers' intentional concealment of the
6  true risks of the drug(s), coupled with dissemination through
7  various media of false and misleading information of the safety
8  of the drug(s) at issue, [which belied] any suggestion of knowl-
9  edge, or reason to know by [the] resident defendants." Cf. *In re*
10 *Rezulin Products Liab. Litig.*, 133 F. Supp. 2d 272, 290 (S.D.N.Y.
11 2001) (finding Mississippi pharmacies facing failure to warn
12 claims fraudulently joined where "the theory underlying the
13 complaints [was] that the manufacturer defendants hid the dangers
14 of Rezulin from plaintiffs, the public, physicians, distributors
15 and pharmacists -- indeed from everyone.")
16     In sum, the court concludes that one could not reasonably
17 read the complaint to support the idea that the retailer defen-
18 dants had knowledge or reason to know of any dangers allegedly
19 associated with PPA. Indeed, reading the complaint as a whole,
20 this allegation reveals itself as directed towards the manufac-
21 turer defendants alone. As such, the court finds that plaintiffs
22 fail to state a products liability cause of action against Bill's
23 Dollar Store.⁸
24
25     ⁸ The complaint once alludes to an "alternative" breach of
26 express warranty claim under the Products Liability Act. *See*
   Miss. Code Ann. § 11-1-63 (a)(1)(4) (requiring a showing that the

ORDER
Page - 7 -

B. **Negligence and Misrepresentation**

The complaint alleges negligence and misrepresentation by
Bill's Dollar Store.  A negligence cause of action also requires
a showing of knowledge or reason to know on the part of the
seller.  _See, e.g._, _R. Clinton Constr. Co. v. Bryant & Reaves,
Inc._, 442 F. Supp. 838, 851 (N.D. Miss. 1977) ("The rule is well
settled that in order to fasten liability upon a party for
negligence, it must be shown by a preponderance of the evidence
that he knew or through the exercise of reasonable care should
have known that his selection of a [product] would cause damage
to his customer.")[1]  A misrepresentation cause of action requires

seller breached an express warranty or failed to conform to other
express factual representations upon which the claimant relied).
However, the products liability allegations go on to touch solely
upon failure to warn and design defect claims.  Because the
complaint lacks any factual basis for support of a breach of
express warranty claim against Bill's Dollar Store, the court
also finds this bare allegation insufficient to support remand.

[1] _Accord Louis_, slip op. at 3-4 & n.3 ("[k]nowledge, or a
reason to know, is also a necessary requisite for any claim of
failure to warn or negligence that a plaintiff might undertake to
assert extraneous to a claim under the Products Liability Act
claim could exist."); _Cadillac Corp. v. Moore_, 320 So.2d 361,
365 (Miss. 1975) (discussing negligence in "vendor/purchaser"
context and stating that "fault on the part of a defendant so as
to render him liable is to be found in action or nonaction,
accompanied by knowledge, actual or implied, of the probable
result of his conduct.")  _Cf._ _Moore v. Memorial Hosp. of
Gulfport_, 825 So.2d 658, 664-66 (Miss. 2002) (extending "learned
intermediary" doctrine to pharmacists in case involving
prescription drug, and holding no actionable negligence claim
could exist against a pharmacy unless a plaintiff indisputably
informed the pharmacy of health problems which contraindicated
the use of the drug in question, or the pharmacist filled

ORDER
Page - 8 -

1 a plaintiff to show:

2     (1) a representation; (2) its falsity; (3) its materi-
3  ality; (4) the speaker's knowledge of its falsity or
   ignorance of its truth; (5) the speaker's intent that
4  the representation should be acted upon by the hearer
   and in the manner reasonably contemplated; (6) the
5  hearer's ignorance of its falsity; (7) the hearer's
   reliance on its truth; (8) the hearer's right to rely
6  thereon; and (9) the hearer's consequent and proximate
   injury.

7 Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 525 (S.D. Miss.
8 2000) (citing Allen v. Mac Tools, Inc., 671 So.2d 636, 642 (Miss.
9 1996)).

10     Again, the court finds that the general and contradictory
11 allegations in the complaint do not support the existence of any
12 knowledge or reason to know on the part of Bill's Dollar Store to
13 support a negligence cause of action.  The court finds the
14 complaint similarly bereft of any factual support for the idea
15 that Bill's Dollar Store made any misrepresentations whatsoever
16 to plaintiffs regarding the PPA-containing products.  See, e.g.,
17 Johnson, 114 F. Supp. 2d at 525 ("Suffice it to say that Plain-
18 tiffs have no proof . . . that any of the named [Mississippi]
19 representatives made any representations directly to any of the
20 Plaintiffs.  Thus, none of the Plaintiffs was the 'hearer' of any
21 of the sales representatives' alleged misrepresentations.";
22 finding plaintiffs had no cause of action for misrepresentation].
23 Instead, as discussed above, the complaint attributes this
24
25 prescriptions in quantities inconsistent with the recommended
26 dosage guidelines).

ORDER
Page - 9 -

1  behavior to the manufacturing defendants alone.  As such, the
2  court also finds that plaintiffs fail to state negligence and
3  misrepresentation causes of action against Bill's Dollar Store.
4  C.   Implied Warranty
5       The complaint also alleges that Bill's Dollar Store breached
6  implied warranties of merchantability and fitness for particular
7  purpose.  See Miss. Code Ann. §§ 75-2-314, 315.  The complaint
8  accuses "defendants" of breaching the implied warranty of mer-
9  chantability in failing to adequately label containers and
10 packages containing PPA, and because the products sold failed to
11 conform to promises or affirmations of facts made on the contain-
12 ers or labels.  See Miss. Code Ann. § 75-2-314 (2)(a)-(f).  The
13 complaint accuses both manufacturers and sellers of breaching the
14 implied warranty of fitness for particular purpose where they had
15 reason to know of the particular use of the products, and the
16 purchasers relied on the sellers' skill or judgment in selecting
17 and furnishing suitable and safe products.  See Miss. Code Ann. §
18 75-2-315.
19       In order to recover for breach of implied warranty, a buyer
20 "must within a reasonable time after he discovers or should have
21 discovered any breach notify the seller of breach or be barred
22 from any remedy."  Miss. Code Ann. § 75-2-607 (3)(a); accord C.R.
23 Daniels, Inc. v. Yazoo Mfg. Co., 641 F. Supp. 205, 210-11 (S.D.
24 Miss. 1986); Gast v. Rogers-Dingus Chevrolet, 585 So. 2d 725,
25 730-31 (Miss. 1991).  Here, the complaint contains no indication
26 that plaintiffs provided Bill's Dollar Store with any notice as

ORDER
Page - 10 -

1  to an alleged breach of warranty prior to the institution of this

2  lawsuit.

3      Additionally, with respect to the merchantability claim, the

4  complaint contains no factual support for a conclusion that

5  Bill's Dollar Store was in any way involved with the labeling

6  and/or packaging of the products at issue.  Instead, the com-

7  plaint alleges that the manufacturer defendants concealed mate-

8  rial facts regarding PPA through product packaging and labeling.

9      The court likewise finds plaintiffs' fitness for particular

10  purpose allegation insufficient.  "Mississippi does not recognize

11  an implied warranty of fitness for a particular purpose when the

12  good is purchased for the ordinary purpose of a good of that

13  kind."  Farris v. Coleman Co., 121 F. Supp. 2d 1014, 1018 (N.D.

14  Miss. 2000) (fitness for particular purpose claim failed where

15  plaintiff purchased cooler to keep food and beverages cold – the

16  ordinary purpose for which a cooler is used).  Here, plaintiffs

17  attested that they purchased PPA-containing products to remedy

18  their "cold, flu, sinus and/or allergy symptoms" – the ordinary

19  purpose of these medications.

20      Therefore, for the reasons stated above, the court finds

21  that plaintiffs fail to state implied warranty causes of action

22  against Bill's Dollar Store.

23  D.   Bankruptcy

24      Bill's Dollar Store filed a bankruptcy petition in February

25  2001, several months prior to the filing of plaintiffs' com-

26  plaint.  The filing of the bankruptcy petition operates as a stay

ORDER
Page – 11 –

1   on judicial or other proceedings brought against Bill's Dollar

2   Store that were or could have commenced prior to the commencement

3   of the bankruptcy proceeding. See 11 U.S.C. § 362(a); In re

4   Cajun Elec. Power Co-Op., Inc., 185 F.3d 446, 457 (5th Cir. 1999).

5         Plaintiffs argue that the automatic stay poses no barrier to

6   relief given that they were unaware of the bankruptcy petition at

7   the time they filed their complaint, and because they anticipate

8   that the Bankruptcy Court will agree to their pending request to

9   lift the stay. However, whether or not plaintiffs knew of the

10   petition and whether or not the stay may later be lifted, the

11   fact remains that, at the time plaintiffs filed their complaint,

12   the stay operated to prohibit their lawsuit. As noted above, the

13   court determines jurisdiction based on the claims as stated at

14   the time of removal. As such, the court finds the existence of

15   the stay at the time of filing serves as an additional reason to

16   deny remand of this matter to state court. Cf. Ritchey, 139 F.3d

17   at 1319-20 (denying remand where the statute of limitations had

18   expired at the time plaintiff filed the complaint).[*]

19                 III.   CONCLUSION

20         The court concludes that plaintiffs fail to state a cause of

21   action against the only non-diverse defendant, and that the

22

23       [*]Unlike in a number of other cases transferred to this MDL,
the defendants here did not supply the court with any summary

24   judgment-type evidence to establish the retailer defendant's
fraudulent joinder. However, the court nonetheless finds that a

25   plain reading of the complaint does not allow a conclusion that
plaintiffs state a cause of action against Bill's Dollar Store.

26

ORDER
Page - 12 -

1  failure is obvious according to the settled rules of Mississippi.
2  As such, the court finds Bill's Dollar Store fraudulently joined
3  and DENIES plaintiff's motion to remand the case to the state
4  courts of Mississippi.

5  DATED at Seattle, Washington this 26th day of November,
6  2002.

7
8                                        BARBARA JACOBS ROTHSTEIN
                                         UNITED STATES DISTRICT JUDGE
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

ORDER
Page - 13 -

**EXHIBIT D**

1
2
3
4
5                                                    28   APR 28 2003
6                                                    UNITED DISTRICT OF CALIFORNIA
                                                     DEPUTY
7
8                        UNITED STATES DISTRICT COURT
9                       CENTRAL DISTRICT OF CALIFORNIA
                              WESTERN DIVISION
10  In re REZULIN LITIGATION
                                              CASE NO. CV 03-1647-R(RZx)
11  JACKIE BARLOW; CARMA DEKOVEN;
    ERNESTINE DELAFONT; ZOE EGGER;             [PROPOSED] ORDER
12  MUKARVIZ; and SAMUEL                       DENYING PLAINTIFFS'
    GODBOULDT,                                 MOTION FOR REMAND
13
              Plaintiffs,
14
         v.
15
    WARNER-LAMBERT CO.; PFIZER INC.;
16  JERROLD OLEFSKY; McKESSON CORP.,
    et al.
17
              Defendants.
18

19       Defendants removed this action from state court to this Court alleging diversity
20  jurisdiction. Defendants asserted that Jerrold Olefsky and McKesson Corp., both of
21  whom are California residents, were fraudulently joined. Plaintiffs moved to remand
22  to state court. The motions came on for hearing by the Court on April 21, 2003.
23       Having considered the motions and other documents in support of and in
24  opposition to the motions, having heard the arguments of counsel, and being fully
25  advised in the matter, the Court denies the motion.
26       The Court finds that Dr. Jerrold Olefsky ("Dr. Olefsky"), a patent-holder and
27  clinical investigator, owed no legal duty to any of the plaintiffs, and, therefore, there
28  is no possibility that the plaintiffs can prove a cause of action against Dr. Olefsky.
    Thus, Dr. Olefsky must be disregarded for purposes of determining federal diversity

03104762.WPD                              1
                              [PROPOSED] ORDER

KAYE SCHOLER LLP

1   jurisdiction.

2       The Court further finds that there is no possibility that plaintiffs could prove a

3   cause of action against McKesson, an entity which distributed this FDA-approved

4   medication to pharmacists in California. Pursuant to comment k of the Restatement

5   (Second) of Torts Section 402A and California law following comment k, a

6   distributor of a prescription drug is not subject to strict liability.

7       Accordingly, this Court has diversity jurisdiction over each of these actions.

8   The motion to remand is denied.

9       IT IS SO ORDERED.

10  Dated: April 28, 2003

11

12                              MANUEL L. REAL

13                              MANUEL L. REAL
                                UNITED STATES DISTRICT JUDGE

14  Submitted by:

15  O'DONNELL & SHAEFFER LLP
    633 West Fifth Street, Suite 1700
16  Los Angeles, California 90071
    Telephone:  (213) 532-2000
17  Facsimile:  (213) 532-2020

18  KAYE SCHOLER LLP
    1999 Avenue of the Stars
19  Los Angeles, California 90067
    Telephone:  (310) 788-1000
20  Facsimile:  (310) 788-1200

21  By:  Robert Barnes
        Robert Barnes
22  Attorneys for  Defendants
    WARNER-LAMBERT COMPANY and PFIZER INC.

23

24

25

26

27

28

S1104763.WPD

2
[PROPOSED] ORDER

**EXHIBIT E**



UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

In re REZULIN LITIGATION

CASE NO. CV 03-1643-R(RZx)

DIANE SKINNER; and DIANE YBARRA,

Plaintiffs,

v.

WARNER-LAMBERT CO.; PFIZER INC.;
JERROLD OLEFSKY; McKESSON CORP.;
et al.

Defendants.

[PROPOSED] ORDER
DENYING PLAINTIFFS'
MOTION FOR REMAND

Defendants removed this action from state court to this Court alleging diversity jurisdiction. Defendants asserted that Jerrold Olefsky and McKesson Corp., both of whom are California residents, were fraudulently joined. Plaintiffs moved to remand to state court. The motions came on for hearing by the Court on April 21, 2003.

Having considered the motions and other documents in support of and in opposition to the motions, having heard the arguments of counsel, and being fully advised in the matter, the Court denies the motion.

The Court finds that Dr. Jerrold Olefsky ("Dr. Olefsky"), a patent-holder and clinical investigator, owed no legal duty to any of the plaintiffs, and, therefore, there is no possibility that the plaintiffs can prove a cause of action against Dr. Olefsky. Thus, Dr. Olefsky must be disregarded for purposes of determining federal diversity jurisdiction.

23104767.WPD

[PROPOSED] ORDER

1   The Court further finds that there is no possibility that plaintiffs could prove a
2   cause of action against McKesson, an entity which distributed this FDA-approved
3   medication to pharmacists in California. Pursuant to comment k of the Restatement
4   (Second) of Torts Section 402A and California law following comment k, a
5   distributor of a prescription drug is not subject to strict liability.
6       Accordingly, this Court has diversity jurisdiction over each of these actions.
7   The motion to remand is denied.
8       IT IS SO ORDERED.
9   Dated: April 23, 2003

                                    MANUEL L. REAL
                                    _____
                                    MANUEL L. REAL
                                    UNITED STATES DISTRICT JUDGE

12  Submitted by:

13  O'DONNELL & SHAEFFER LLP
14  633 West Fifth Street, Suite 1700
    Los Angeles, California 90071
15  Telephone:  (213) 532-2000
    Facsimile:   (213) 532-2020
16
17  KAYE SCHOLER LLP
    1999 Avenue of the Stars
18  Los Angeles, California 90067
    Telephone:  (310) 788-1000
19  Facsimile:   (310) 788-1200

20  By: Robert Barnes
    _____
21  Robert Barnes
    Attorneys for Defendants
22  WARNER-LAMBERT COMPANY and PFIZER INC.

23
24
25
26
27
28

KAYE SCHOLER LLP

23104767.WPD

2

[PROPOSED] ORDER